1  Lisa S. Kantor, Esq. - State Bar No. 110678
      Email: lkantor@kantorlaw.net
2  Elizabeth K. Green, Esq. - State Bar No. 199634
      Email: egreen@kantorlaw.net
3  KANTOR & KANTOR, LLP
   19839 Nordhoff Street
4  Northridge, CA 91324
   (818) 886-2525 (TEL)
5  (818) 350-6272  (FAX)

6  Attorneys for Plaintiff,
   DAVID WALKER

7

8

9                    UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

11

12  DAVID WALKER,                      )  CASE NO: C 07-3772 WHA
                                       )
13          Plaintiff,                 )  PLAINTIFF'S OPPOSITION TO
                                       )  DEFENDANTS' MOTION FOR SUMMARY
14     VS.                             )  JUDGMENT
                                       )
15  METROPOLITAN LIFE INSURANCE        )  [Concurrently Filed with Declaration of Elizabeth
    COMPANY; KAISER PERMANENTE         )  K. Green]
16  FLEXIBLE BENEFITS PLAN, and DOES 1 )
    THROUGH 10, INCLUSIVE,             )  Date:       February 14, 2008
17                                     )  Time:       3:00 p.m.
            Defendants.                )  Courtroom:  9
18  _____   )  Judge:      Honorable William Alsup

19

20      Plaintiff David Walker hereby opposes Defendants Metropolitan Life Insurance Company

21  and Kaiser Permanente Flexible Benefits Plan's Motion for Summary Judgment.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     The Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.     Plaintiff's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.     Plaintiff's Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      D.     MetLife Denied Mr. Walker's LTD Claim . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      E.     Mr. Walker Appealed the Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      F.     MetLife Sought Medical Reviews from NMR . . . . . . . . . . . . . . . . . . . . . . . 8

      G.     MetLife Upheld the Denial of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.   The Plan Does Not Adequately Delegate Discretion to MetLife . . . . . . . . . . . . . . . . . 10

IV.   The Court's Review of the Claim Decision Must Take Into Account the "Nature, Extent, and Effect" of MetLife's Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    MetLife Did Not Conduct a Full and Fair Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.     MetLife Ignored the Side Effects of Multiple Medications Which Contributed to Mr. Walker's Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.     MetLife Conducted a Selective Review by Ignoring Subjective Complaints . . . . . . 13

      C.     MetLife Failed to Consider the Co-Morbidity Effects of Mr. Walker's Multiple Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      D.     MetLife Relied On the Faulty Opinions of Biased Reviewers . . . . . . . . . . . . . . . 16

           1.     NMR Is Not Independent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           2.     The Medical Reviewers Misstated the Record . . . . . . . . . . . . . . . . . . . . 16

      E.     MetLife Ignored The Social Security Administration's Determination that Mr. Walker Was Disabled From Any Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.   Summary Judgment is Not Proper Because Plaintiff is Entitled to Obtain Evidence Through Discovery That Supports Plaintiff's Claim that MetLife Abused its Discretion . . . . . . . . 19

      A.     The Court May Consider Evidence Other Than the Claim File . . . . . . . . . . . . . . 19

VII.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3 *Abatie* v. *Alta Health & Life Ins. Co.*
458 F.3d 955 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 19

4

*Abrams* v. *Cargill*
5 395 F.3d 882 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6 *Alvarez* v. *Unum Life Ins. Co. of Am.*
2007 WL 2348737, *7 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

7

*Audino* v. *Raytheon Co. Short Term Disability Plan*
8 129 Fed.Appx. 882 (Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9 *Austin* v. *Continental Casualty Co.*
216 F.Supp.2d 550 (W.D. N.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

10

*Baldoni* v. *Unumprovident, Illinois Tool Works, Inc.*
11 2007 WL 649295, *6 (D. Or. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

12 *Beckstrand* v. *Electronic Arts Group Long Term Disability Ins. Plan*
2007 WL 1599769, *5 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13

*Black & Decker Disability Plan* v. *Nord*
14 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) . . . . . . . . . . . . . . . . . . . 12, 16, 18

15 *Booton* v. *Lockheed Med. Benefit Plan*
110 F.3d 1461 (9th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16

*Calvert* v. *Firstar Finance*
17 409 F.3d 286 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 Conrad v. Reliance Standard Life Ins. Co.
292 F.Supp.2d 233 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

19

*Earnest v. Metropolitan Life Ins. Co.*
20 291 F.Supp.2d 1327 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

21 *Etkin* v. *Merk & Co.*
2001 WL 1346368, *2 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22

*Fair* v. *Bowen*
23 885 F.2d 597 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

24 *Firestone Tire & Rubber Co.* v. *Bruch*
489 U.S. 101 (U.S. Pa. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25

*Flanigan* v. *Liberty Life Assur. Co. Of Boston*
26 227 F.Supp.2d 840 (S.D. Ohio 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27 *Force* v. *Ameritech Corp., Inc.*
452 F.Supp.2d 744 (E.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28

Case No. C 07-3772 WHA
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Gannon* v. *Metropolitan Life Ins. Co.*
  360 F.3d 211 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Godfrey* v. *BellSouth Communications*
  89 F.3d 755 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Govindarajan* v. *FMC Corp.*
  932 F.2d 634 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Groom* v. *Standard Ins. Co.*
  492 F.Supp.2d 1202 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gullidge* v. *Hartford Life & Acc. Ins. Co.*
  —F.Supp.2d—, 2007 WL 2362912, *2 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . 20

*Harper* v. *Unum Life Ins. Co. of America*
  2007 WL 1792004, *5 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill* v. *Metropolitan Life Ins. Co.*
  218 F.Supp.2d 128 (D. Puerto Rico 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Howard* v. *Heckler*
  782 F.2d 1484 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Johnson* v. *Blue Cross and Blue Shield of Alabama*
  457 F.Supp.2d 1288 (N.D. Ala. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kearney* v. *Standard Ins. Co.*
  175 F.3d 1084 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ladd* v. *ITT*
  148 F.3d 753 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Linich* v. *Broadspire Services, Inc.*
  2007 WL 841509, *6 (D. Ariz. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Liu* v. *Standard Ins. Co.*
  457 F.Supp.2d 1030 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Marcus* v. *Califano*
  615 F.2d 23 (2nd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McCurdy* v. *Metropolitan Life Ins. Co.*
  2007 WL 915177, *2 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Myers* v. *Hercules*
  253 F.3d 761 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Palmer* v. *Standard Ins. Co.*
  994 F. Supp. 1221 (D.C. Or. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pierce* v. *Kentucky Utilities Company's Long Term Disability Plan*
  357 F.Supp.2d 979 (E.D. Ky. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Regula* v. *Delta Family-Care Disability Survivorship Plan*
   266 F.3d 1130 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Riedl* v. *General American Life Ins. Co.*
   248 F.3d 753 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rodriguez-Abreu* v. *Chase Manhattan Bank, N.A.*
   986 F.2d 580 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Shane* v. *Albertson's Inc. Employees' Disability Plan*
   2005 WL 1902130, *1 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Spangler* v. *Lockheed Martin Energy Systems*
   313 F.3d 356 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*Starr v. MGM* Mirage
   2007 WL 1560335, *4 (D. Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sterio* v. *Highmark Life Ins. Co.*
   2007 WL 1650929 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Torgeson* v. *Unum Life Ins. Co. of America*
   466 F.Supp.2d 1096 (N.D. Iowa 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tremain* v. *Bell Industries*
   196 F.3d 970 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Utter* v. *Unum*
   404 F.Supp.2d 1204 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Welch* v. *Metropolitan Life Ins. Co.*
   480 F.3d. 942 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Welsh* v. *MetLife*
   229 F.3d 1161 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL STATUTES**

29 U.S.C. §§ 1132(a), (e), (f) and (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
29 U.S.C. § 1105(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
42 U.S.C.A. § 423(d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Introduction

This case involves David Walker's claim for long term disability ("LTD") benefits which were denied by Metropolitan Life Insurance Company ("MetLife"). This action was brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") as it involves a claim by Plaintiff for employee benefits under the employee benefit plans regulated and governed under ERISA. Plaintiff was entitled to LTD benefits as an employee of Kaiser Permanente. MetLife is the insurer of benefits under the LTD Plan and also claims to be the Plan fiduciary as defined by ERISA.

MetLife determined Mr. Walker was disabled from his own occupation as an LAN ("Local Area Network") Administrator with Kaiser Permanente from August 20, 2005, the date he stopped working, through October 24, 2005. However, MetLife determined that Mr. Walker was not disabled during the *entire* six month elimination period and thus, refused payment of any LTD benefits. Plaintiff appealed and MetLife upheld its decision.

Mr. Walker is 64 years old and suffers from multiple disabling conditions including Type 2 Diabetes (insulin dependent for over 25 years), Peripheral Neuropathy, Cardiomyopathy, Hypertension, Glaucoma, and Macular Degeneration, for which he takes 14 daily medications amounting to 30 pills per day (not including insulin and eye drops). The cumulative effect of the medications and the conditions renders Mr. Walker unable to work in any capacity. MetLife's determination that Mr. Walker could work his medium capacity occupation in his early 60s while suffering from the aforementioned conditions and enduring the side effects (*i.e.* dizziness, fatigue, blurred vision, and headaches) of the several medications he takes on a daily basis was arbitrary and capricious.

II.    **Statement of Facts**

    A.    **The Policy**

       Kaiser Permanente created a Summary Plan Description ("SPD") listing MetLife as the insurer and third party administrator for the LTD plan. (163[1]). No policy was produced by Defendants. The SPD provides LTD benefits of 60% of the insured's basic monthly salary after six months of continuous total disability. (108). The policy defines total disability:

- During your elimination period and the next 24-month period, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy, or;

- After the first 24 months, you are unable to earn more than 80% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified, taking into account your education, training, experience and pre-disability earnings. (108).

       The SPD generally provides benefits for insureds until age 65. For insureds who become disabled after age 61, a schedule in the SPD lists the duration of benefits. (109). As Mr. Walker became disabled in August 2005 at age 61, he was entitled to 48 months of LTD benefits, from February 17, 2006 (following the six month elimination period) to February 16, 2010.

    B.    **Plaintiff's Background**

       Mr. Walker is a 64 year old man (born September 21, 1943) with a Bachelor of Arts degree in International Business and Information Systems. (524, 598). Mr. Walker began his position as an LAN Administrator with Kaiser in March 1998. (598).

       The LAN Administrator position is a medium capacity occupation, meaning that it requires occasional lifting or carrying up to 50 lbs., as well as 1-2 hours of standing, walking, bending over, twisting, reaching above the shoulder, or crouching/stooping. (568). The position required significant experience (usually at least five years) in data processing field, previous experience in

---

    [1] Referencing the bates stamped pages from the claim file produced by MetLife and filed with the Court.

1  LAN support, network design, installation and operation.  Mr. Walker worked with systems,
2  technical staff and clients on support, network design and management of multiple Local Area
3  Networks (LANs).  (570).

4        As Mr. Walker described his position to MetLife: "sitting at a computer and typing is only a
5  small part of what he does. [Mr. Walker] states the he also has to lift/carry computers and replace
6  monitors. [He] has to crawl around the floor connecting wiring for computers and climbing up in
7  ceilings pulling wires."  (180).

8        Prior to his education and employment in computers, he was in the United States Army and
9  was also a Probation Officer until he was shot on duty.

10       **C.    Plaintiff's Disability**

11       In June 2005, Mr. Walker began experiencing shortness of breath, chest pains and was
12  diagnosed with cardiomyopathy and fairly severe hypertension.  (471, 548).  He also had a history of
13  type 2 diabetes mellitus and his insulin dependence for 25 years resulted in complications of
14  retinopathy and neuropathy. (562, 471).  In July 2005, Mr. Walker was admitted to Kaiser Hospital
15  with pulmonary edema.  (552).  An echocardiogram confirmed diastolic dysfunction.  (552).  His
16  discharge diagnoses were:

17       (1)    Type 2 diabetes mellitus (a) peripheral neuropathy. (b) nephropathy.
18       (2)    Hypertension.
19       (3)    Dyslipidemia.
20       (4)    Glaucoma, open angle.
21       (5)    Coronary vascular disease. (a) cardiac catherization 06/2004 with insignificant
22              obstruction. (b) normal transesophageal echocardiogram 07/2005.
23       (6)    Organic heart disease. (a) concentric left ventricular hypertrophy. (b) hypertensive
24              heart disease. (c) dystolic dysfunction.
25       (7)    Rotator cuff tendinitis.
26       (8)    Status post pneumonia 02/2005.

1  (552).  Upon release, he was given two new medications, Nifedipine (90 mg daily) and Lasix (20 mg

2  twice daily), in addition to his prior medications: Lipitor (40 mg daily), minoxidil (2.5 mg 4 tablets

3  twice daily), terazosin (5 mg twice daily), atenolol (100 mg once daily), K-Dur (20 mg twice daily),

4  metformin (500 mg twice daily), Lantus insulin (50 units) and novolog (with each meal), aspirin (81

5  mg daily), Cozaar (25 mg 4 times daily), Lumigan eye drops (.03% 1 drop daily).  (552).

6        Mr. Walker's edema worsened (554, 557) and he noticed fluid retention on his left leg.

7  (558).  His primary care physician at Kaiser, George Chuang, M.D., recommended compression

8  stockings.  (559).  On August 21, 2005, Mr. Walker stopped work.  (598).  He subsequently received

9  sick pay from Kaiser.  (598).

10        On September 15, 2005, Mr. Walker complained of episodes of very blurry vision to his

11  doctor. (560).  In October 2005, Dr. Chuang noted that they needed to better control Mr. Walker's

12  hypertension and had him use a blood pressure monitor at home.  (563).  In January 2006, upon

13  return from a trip overseas[2], Mr. Walker stated that his shortness of breath had worsened.  (564).

14        On January 20, 2006, Mr. Walker submitted his claim for LTD benefits with MetLife.  (576).

15  Dr. Chuang completed an Attending Physician's Statement for MetLife and listed Mr. Walker's

16  functional capacity as Class 3 (Marked Limitation) and advised Mr. Walker not to return to work

17  until July 13, 2006.  (549).

18        On March 1, 2006, MetLife conducted a telephone interview with Mr. Walker in which he

19  informed MetLife that he had diabetes and glaucoma.  (178).  He told MetLife that he did not plan to

20  return to work due to the side effects of the multiple medications he took for his various conditions.

21  (178).  Specifically, he said that medication caused him to have blurred vision and his doctor told

22  him he would have to learn to live with it.  (178).  Mr. Walker said that he called his blood pressure

23

24

---

25      [2]  Mr. Walker's explained to MetLife that he had a lot of health problems on his trip
   including difficulty walking, shortness of breath, feeling his heart pounding, and weakness in his
26  legs. (180).  Moreover, Mr. Walker's trip was planned before he was forced to take leave from his
   job.  His attempt to make the pre-planned trip is not evidence that he was capable of work. *Howard
27  v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986) (SSDI claim of pain-induced disability not gainsaid
   by capacity to engage in periodic restricted travel); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)
28  (One does not need to be "utterly incapacitated" in order to be disabled).

1  readings in daily to a heart monitoring nurse and that his blood pressure readings were too high.

2  (178).

3        On March 20, 2006, Mr. Walker returned his Personal Profile form to MetLife. (511-525).

4  Mr. Walker stated that he curtailed his activities due to his diminishing eyesight. He stated that he

5  does not drive at night and reading road signs is problematic at times. (514). He also provided his

6  blood pressure readings and detailed information on his 14 medications[3]. (517-525). He noted that

7  the cumulative effect of the drugs caused vision problems in his left eye. Mr. Walker explained that

8  he was legally blind in his right eye (and had been since birth), thereby causing any vision changes in

9  his left eye to be that much more profound. (518). ***Mr. Walker stated that the only way he could***

10  ***return to work would be "to curtail the current medication regimen and have the diabetes,***

11  ***glaucoma, congestive heart failure and high blood pressure controlled or cured without drugs. If***

12  ***anyone can figure a way to do this, I'll be the first in line to try it.***" (520).

13        In an April 10, 2006 conversation with MetLife, Mr. Walker described the symptoms that

14  made it impossible for him to continue working (as transcribed in MetLife's claim diary):

15      EE [Employee] was working one day in August and after replacing older computer

16      monitors with new flat screen monitors and packing the old ones away, EE was very

17      winded and short of breath. EE was also having increasing difficulty reading

18      computer screen due to blurred vision. EE wears glasses and has HX of retinopathy.

19      EE required laser treatment about 5 years ago which helped but vision has been

20      progressively deteriorating. EE has trouble reading and if he is focusing for example

21      on someone's face directly, the center is fuzzy and has to look toward the side to

22      make out the image. . . . EE has decreased strength in arms and legs. When he gets

23      out of the car, he has to swing his legs out and lean forward to pull himself up. EE

24

25

26

27     [3] Mr. Walker wrote that he took the following medications on a daily basis and provided a medication time table: (1) Novolog Insulin; (2) Lantus Insulin; (3) Lumigan eye drops; (4) Diltia XT; (5) Terazosin; (6) Minoxidil; (7) Coreg; (8) Lipitor; (9) Klor-Con M20; (10) Aspirin; (11)

28  Furosemide; (12) Cozaar; (13) Notriptyline; and (14) Metformin. (521-522).

1   states he told his doctor but was told the medications he is on will cause decreased

2   strength. . . . EE always has some swelling in his ankles and wheeze at night. (180).

3   On April 11, 2006, MetLife referred Mr. Walker's file to a physician consultant for review. (182).

4       On April 14, 2006, Kathleen Kelley, M.D. performed a paper review for MetLife. (497-503).

5   Dr. Kelley listed Mr. Walker's diagnoses as: shortness of breath, cardiomyopathy, hypertension, type

6   2 diabetes, and peripheral neuropathy. (497). Although Dr. Kelley acknowledged Mr. Walker "had

7   pulmonary function studies done which demonstrated some degree of restrictive lung disease," she

8   concluded that "a significant degree of ongoing functional impairment is not documented in the

9   medical record." (498). She also noted that he continued to have several chronic medical conditions

10  requiring medication adjustment and frequent monitoring. (498). Dr. Kelley opined that Mr. Walker

11  was only disabled from his occupation from his last day of work through October 24, 2005 based on

12  a September 2005 note by Dr. Chuang in the medical records. (499, 502). Dr. Kelley grasped onto

13  the October 24, 2005 date despite the more recent Attending Physician's Statement by Dr. Chuang

14  on January 25, 2006 in which he advised that Mr. Walker could not return to work until July 16,

15  2006. (503, 549).

16      On April 20, 2006, Mr. Walker wrote to MetLife regarding his vision. (535). Mr. Walker

17  explained that he saw ophthalmologist Steven Blum, M.D. of the Coeur d'Alene Medical Center in

18  Idaho. Upon examination, Dr. Blum determined that Mr. Walker suffered from Macular

19  Degeneration. Dr. Blum also stated that although the medications were likely having on blurring

20  effect on his vision, the most likely cause and the one befitting the symptoms was Macular

21  Degeneration. (468, 535). Mr. Walker stated that he experienced blurred splotches when he

22  attempted to focus on a person's face, computer screen, or newspaper. (535). Dr. Blum's report

23  noted that Mr. Walker's blood pressure was still not under control (rarely getting his systolic into

24  160, diastolics to run under 90) despite heavy drug therapy. (471).

25      On April 27, 2006, MetLife wrote to Dr. Chuang, enclosed Dr. Kelley's report, and requested

26  Dr. Chuang's comments. (494).

27

28

1    On May 9, 2006, Dr. Chuang wrote a handwritten note on a copy of a letter he received from

2    MetLife stating only: "I agree with the plan for long-term disability." (494). In context of Dr.

3    Chuang's last Attending Physician's Statement which stated that Mr. Walker could not return to

4    work until July 2006, it could be reasonably inferred that Dr. Chuang did not read the materials sent

5    to him but rather confirmed his "plan" for long term disability for Mr. Walker. As nothing was sent

6    to Dr. Chuang about MetLife's "plan" for long term disability, it would seem reasonable to

7    understand Dr. Chuang as referring to his previous plan for Mr. Walker to stay off work.

8    **D.    MetLife Denied Mr. Walker's LTD Claim**

9    On June 16, 2006, MetLife wrote to Mr. Walker and denied his LTD claim. (491-493).

10    MetLife claimed Mr. Walker was disabled only from his last day of work through October 24, 2005

11    and thus, did not satisfy the elimination period. (491). MetLife relied on Dr. Kelley's review and

12    claimed that Dr. Chuang agreed with the denial. MetLife did not mention Dr. Blum's report, or Mr.

13    Walker's vision problems.

14    **E.    Mr. Walker Appealed the Decision**

15    On August 10, 2006, Mr. Walker's attorneys wrote to MetLife regarding his appeal of the

16    denial. (457-461). ***On September 30, 2006, the SSA awarded disability benefits to Mr. Walker***

17    ***beginning February 2006.*** (258-260).

18    On February 8, 2007, Mr. Walker's attorney submitted his appeal. (261-447). Mr. Walker

19    provided a statement from Dr. Chuang who listed Mr. Walker's symptoms as shortness of breath,

20    vision impairment, and fatigue. (264). Dr. Chuang wrote: ***"I don't think he can sustain an 8 hour***

21    ***workday in any career given his symptoms***." (265). Mr. Walker also reiterated that he suffered side

22    effects from his medications, including fatigue, dizziness, blurred vision, nervousness, chest pain,

23    confusion, and headaches. (261-262). In June 2006, Mr. Walker was taking 14 medications each

24    day including eye drops, two different insulin shots, and 30 pills. (521-522). Mr. Walker provided

25    118 pages of information regarding the side effects of the medications he consumed on a daily basis.

26    (261-447). Mr. Walker also submitted an Echocardiography Report exercise stress test showing his

27    inability to continue to due shortness of breath and chest tightness. (270).

28

F.    **MetLife Sought Medical Reviews from NMR**

MetLife sought medical reviews from Network Medical Review Company ("NMR"), a company providing medical reviews solely for insurance companies. None of the reviewing physicians examined Mr. Walker.

The first review was prepared by Michael Rosenberg, M.D. on February 27, 2007. (243-246). Dr. Rosenberg stated that Mr. Walker's medications Terazosin and Minoxidil "have been associated with profound pedal edema, and may be participating in the claimant's symptoms of pedal edema." (244). He also noted that "venous insufficiency and powerful vasodilating drugs are participating in the pedal edema." (244). Without explaining further, Dr. Rosenberg stated that Mr. Walker's complaints of shortness of breath were "inconsistent with a four-week trip taken to Southeast Asia." (244). Dr. Rosenberg did not cite the records in which Mr. Walker described his health problems while traveling and the subsequent deterioration of his condition. Dr. Rosenberg also explicitly deferred discussion of Mr. Walker's vision problems. (245). Yet Dr. Rosenberg concluded that Mr. Walker "would be capable of medium work on a full time basis." (244).

The second review was by David Turok, M.D., who claimed to specialize in neurology and ophthalmology.[4] (247-250). MetLife asked: "Does the medical information support functional limitations (physical) from DLW 8/20/05 to the LTD benefit start date (2/17/06) and forward?" (248). Dr. Turok erroneously responded, "No. It does not. The first mention of vision problems, other than his long standing monocular vision, was a complaint of blurred vision on an optometry visit with Dr. Blum, dated 3/24/06." (248). Dr. Turok was wrong. On September 15, 2005, Mr. Walker complained of "episodes of very blurry vision," to his doctors at Kaiser. (560). Dr. Turok was also wrong in stating that Mr. Walker's level of functionality was unrestricted by his blurred vision. (248). Dr. Turok claimed that Mr. Walker's monocular vision (blind in one eye) did not affect his level of function because he had functioned with just one eye his whole life. ***Dr. Turok***

---

[4]   In truth, Dr. Turok's practice is exclusively cosmetic surgery. (Declaration of Elizabeth K. Green ("Green Decl."), Exh. A, p. 1). Dr. Turok's website (http://www.dr.turok.com/) describes Dr. Turok as a "Cosmetic Surgeon" who specializes in "bringing back your youthful appearance," listing procedures of "Body Contouring" and "Facial Rejuvenation." (Green Decl., Exh. A, p. 1).

*ignored the inevitable fact that any vision problems in the one healthy eye, even episodes of blurry vision, would render Mr. Walker effectively blind in both eyes during such times.*

In April 2007, Mr. Walker responded to Dr. Rosenberg's review. (236-237). He pointed out that Dr. Rosenberg failed to specifically answer MetLife's question regarding the side effects of medications other than to say that they contribute to edema, but do not necessarily pose a safety risk. (236-237). Mr. Walker reiterated that symptoms from the profound pedal edema included blurred vision, congestion in lungs, and extreme fatigue. (237).

On April 11, 2007, Dr. Chuang responded to the review of Dr. Rosenberg. (238). Dr. Chuang wrote that Mr. Walker's "ophthalmologic involvement (diabetic retinopathy) from his diabetes is problematic for him to function normally. His retinopathy will only get worse." (238). Dr. Chuang also stated that Mr. Walker's "functionality is significantly limited by the edema in his lower legs caused by CHF [congestive heart failure], vasodilating medications and as well as significant pain from the diabetes neuropathy." (238). *Dr. Chuang strongly advised MetLife to reconsider Mr. Walker's claim for disability.* (238).

Dr. Rosenberg then reviewed Dr. Chuang's letter and interestingly commented: "Pain from diabetic neuropathy is beyond the scope of this reviewer's assessment, but this would exist in a resting state at home in no different a fashion that it would occur at work." (228). So although Dr. Rosenberg stated that it was beyond his scope to comment, he did so anyway and provided a rationale that the condition would be the same at work as at home, so in essence, just work with it.

A third review by Dr. Rosenberg focused on Mr. Walker's medications. (220-221). Oddly, MetLife did not provide to Dr. Rosenberg the 118 pages of information regarding the side effects of the medications submitted by Mr. Walker. Dr. Rosenberg concluded that the medications taken by Mr. Walker each day in the amount of 30 pills, did not pose a safety risk, but they might have contributed to edema. (220). Dr. Rosenberg failed to comment on any specific medication's side effects or the complaints by Mr. Walker associated with his medications.

### G. MetLife Upheld the Denial of Benefits

On June 18, 2007, MetLife wrote to Mr. Walker and upheld its denial of LTD benefits. (213-216). MetLife repeated the opinions of Drs. Turok and Rosenberg almost verbatim. For example, MetLife claimed that Mr. Walker's "pain would exist in a resting state at home in no different a fashion than it would occur at work." (215). And MetLife failed to acknowledge the cumulative side effects of the different medications in addition to the co-morbidity effects of the various conditions.

Mr. Walker filed this action against MetLife and the Plan on July 18, 2007.

### III. The Plan Does Not Adequately Delegate Discretion to MetLife

Under ERISA, the default standard of review is that of *de novo*, as there is nothing in ERISA that requires that claims decisions be afforded discretion by the courts. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). MetLife must show that the plan gave it discretionary authority in order to get any judicial deference to its decision, and MetLife bears the burden of proving that such discretion has been unambiguously granted under the terms of the plan. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).

Here, MetLife did not produce a policy of insurance or any contract with Kaiser. Defendant's statement that the Plan "provides LTD benefits funded through a group policy of insurance issued by MetLife" is not supported by the record. (Defendant's Motion at 3:21-22). MetLife has only produced a "Kaiser Permanente Summary Plan Description" (the "SPD") which lists "Met DisAbility" as the Claims Administrator. (160). MetLife also produced a "Kaiser Permanente Welfare Benefits Plan" (the "Plan"). (001-013).

The Plan states that benefits are provided "*under a Contract* in which the Insurer is responsible for a review of benefits claim determinations." (007) (Emphasis added). Although this is the specific language cited by Defendant for its claim of discretionary authority, ***there is no contract between MetLife and Kaiser as required by the Plan for MetLife to be a named fiduciary***. (007). The Plan defines a contract as "an insurance, stop-loss, administrative service, or other contract between one or more Employers and an Insurer under which benefits of a Program are

1  provided." (001). According to the language of the Plan, MetLife is not a fiduciary because the

2  requirements of the Plan have not been met (*i.e.* contract with the Insurer). When fiduciary duties

3  are to be allocated to third parties: (1) The written plan instrument must expressly allow for the

4  delegation, including an explanation of the specific procedures that must be complied with in

5  completing the delegation, and (2) there must also be an actual *delegation* of discretionary authority

6  in writing, by one who originally possesses it, or it is deemed ineffective. *Shane v. Albertson's Inc.*

7  *Employees' Disability Plan*, 2005 WL 1902130, *1 (C.D. Cal. 2005) ("The court must examine the

8  specific language of a plan to determine the standard of review."); *Rodriguez-Abreu v. Chase*

9  *Manhattan Bank, N.A.*, 986 F.2d 580, 583-584 (1st Cir. 1993), interpreting 29 U.S.C. § 1105(c)).

10  Kaiser may have intended to authorize MetLife to be a claims administrator for the Plan, but

11  it did not properly confer discretion upon MetLife. Thus, the appropriate standard of review is *de*

12  *novo*.

13  **IV.    The Court's Review of the Claim Decision Must Take Into Account the "Nature,**

14  **Extent, and Effect" of MetLife's Conflict of Interest**

15  Under any standard of review, MetLife's decision was wrong and must be reversed.

16  Presuming MetLife was properly granted discretion to determine eligibility for benefits, by virtue of

17  the same Plan, MetLife also funded the benefits to be paid under the Plan. Therefore, MetLife is an

18  inherently conflicted fiduciary and its claim decision should not be reviewed under the strict abuse of

19  discretion standard. Rather, the mere fact that MetLife is a conflicted fiduciary must be weighed by

20  the Court, together with any other evidence which tends to show the "nature, extent and effect" that

21  MetLife's conflict had on the claim decision. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955

22  (9th Cir. 2006). Thus, the amount of deference given to a conflicted claims administrator's decision

23  depends upon the severity of the conflict demonstrated. In *Abatie*, the Court pointed to some

24  examples of the type of evidence demonstrating a "heavy" conflict that would substantially reduce

25  the amount of deference provided to any administrator's decision:

26  A court may weigh a conflict more heavily if, for example, the administrator provides

27  inconsistent reasons for denial, *Lang*, 125 F.3d at 799; **fails adequately to**

28

1   **investigate a claim or ask the plaintiff for necessary evidence**, *Booton v. Lockheed*
2   *Med. Benefit Plan*, 110 F.3d 1461, 1463-64 (9th Cir.1997); **fails to credit a**
3   **claimant's reliable evidence**, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,
4   834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); or has **repeatedly denied benefits to**
5   **deserving participants by interpreting plan terms incorrectly** or by **making**
6   **decisions against the weight of evidence** in the record.

7   *Abatie*, 458 F.3d at 968-969. (Emphasis added). Here, MetLife failed to adequately investigate the
8   claim by ignoring evidence submitted by Plaintiff regarding his medications. Failure to investigate a
9   claim is arbitrary and capricious conduct even under the most stringent arbitrary and capricious
10  standard of review. *Booton v. Lockheed*, 110 F.3d 1461, 1463-1464 (9th Cir. 1997). Under *Abatie*, it
11  is evidence of a "serious" conflict, substantially reducing any deference provided by the trial court to
12  the claim decision.

13      MetLife also failed to credit Plaintiff's reliable medical evidence, including Dr. Chuang's
14  letters describing the functional limitations posed by Plaintiff's multiple conditions, and Mr.
15  Walker's subjective complaints. Failure to credit a claimant's reliable medical evidence is also
16  grounds for the trial court to substantially reduce any deference give to the claims administrator.
17  *Abatie*, 458 F.3d 955. MetLife also demonstrated its self-interest at Mr. Walker's expense by relying
18  on faulty reports of biased medical reviewers and disregarding the Social Security Administration's
19  decision to award disability benefits.

20      MetLife's decision is deserving of little, if any deference, under the arbitrary and capricious
21  standard. The Court should view MetLife's claim decision with a high degree of skepticism,
22  commensurate with the biased nature in which MetLife handled this claim.

23  **V.    MetLife Did Not Conduct a Full and Fair Review**

24          **A.    MetLife Ignored the Side Effects of Multiple Medications Which Contributed to**
25                  **Mr. Walker's Impairment**

26      MetLife blatantly ignored a contributing factor to Mr. Walker's disabling condition: the
27  effect of 14 daily medications. Mr. Walker wrote to MetLife, that the only way he could return to
28

1   work would be *"to curtail the current medication regimen and have the diabetes, glaucoma,*

2   *congestive heart failure and high blood pressure controlled or cured without drugs. If anyone*

3   *can figure a way to do this, I'll be the first in line to try it."* (520). Without a doubt, medications

4   have saved Mr. Walker's life. He has had a relatively high level of functioning for over 60 years,

5   despite his longstanding affliction with type 2 diabetes and its associated conditions such as

6   neuropathy, hypertension, and glaucoma. MetLife was arbitrary and capricious to overlook the

7   effects of the multiple medications that Mr. Walker is forced to take on a daily basis to maintain even

8   his current level of function.

9        In his appeal, Mr. Walker provided legal authority supporting the consideration of

10  medications in determining disability. (262). *See Godfrey v. BellSouth Communications*, 89 F.3d

11  755, 759 (11th Cir. 1996) (Holding that insurer's decision to deny benefits was arbitrary where it

12  ignored the side effects of drowsiness caused by medication, the Court stating: "It seems to the court

13  that the only rational explanation for the failure of the defendant's physicians to follow up on the

14  evidence they did have and to ignore the effects of the medications that the plaintiff was taking is

15  that *they knew in fact that the plaintiff was disabled* and following up leads and considering the

16  effect of the medications would only confirm what any reasonable doctor would have already

17  known."), cited with approval in *Utter v. Unum*, 404 F.Supp.2d 1204, 1213 (C.D. Cal. 2005);

18  *Flanigan v. Liberty Life Assur. Co. Of Boston*, 227 F.Supp.2d 840, 844 (S.D. Ohio 2003) ("The fact

19  that Plaintiff is on many strong medications is objective evidence that she is indeed chronically

20  disabled."); *Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233, 241 (D. Mass. 2003)

21  (RSL denied the claimant a full and fair review by only inquiring into the claimant's ability to sit,

22  stand, walk, etc., without considering the effects of the claimant's potent pain medications).

23       **B.    MetLife Conducted a Selective Review by Ignoring Subjective Complaints**

24       MetLife's decision to terminate Plaintiff's benefits was based upon a selective medical

25  review of the medical evidence, ignoring his physical symptoms and complaints. A selective review

26  is arbitrary and capricious conduct. *Spangler v. Lockheed Martin Energy Systems*, 313 F.3d 356,

27

28

1  362 (6th Cir. 2002) (Criticized the insurer for using "cherry picked" evidence); *Myers v. Hercules*,

2  253 F.3d 761 (4th Cir. 2001); *Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir. 1991).

3      Moreover, Courts are clear that, where a claimant's condition does not lend its self easily to

4  objective verification, such as in cases of pain, the claimant's subjective reports must be considered

5  and should, unless shown otherwise, be relied upon.  A plan administrator may not disregard a

6  claimant's reports of symptoms where the condition presented is difficult to objectively measure in

7  the absence of a "specific, clear and convincing reason" such as a demonstrated lack of credibility on

8  the part of the claimant. *Palmer v. Standard Ins. Co.*, 994 F. Supp. 1221, 1233-1234 (D.C. Or.

9  1998); *Marcus v. Califano*, 615 F.2d 23, 27 (2nd Cir. 1979) ("Subjective evidence of appellant's

10  pain, based on her own testimony and the medical reports of examining physicians, is more than

11  ample to establish her disability, if believed.").  Mr. Walker and his doctors attributed many of his

12  symptoms, such as leg fatigue and blurred vision, to the medications and Dr. Chuang told Mr.

13  Walker that he had to live with it because he needed to be on the medications.  But MetLife

14  disregarded Mr. Walker's self-reports of his pain, fatigue and physical limitations, including a

15  narrative by Mr. Walker for his appeal:

16      By August of 2005 the situation had deteriorated so that anytime I had to focus my

17      attention on reading a computer screen, any printed matter, on paper or the chasse of a

18      computer, or any other activity that required eye concentration was becoming more

19      problematic as the days passed, even the use of a magnifying glass was becoming

20      difficult. . . .[W]hen watching TV in the evenings I am no longer able to read any

21      printing appearing on the screen.  I can see the characters moving, but it requires

22      constant squinting and consciously focusing and refocusing my vision just to make

23      out what is on the screen. . . . I exhaust very quickly, much faster than just a few years

24      ago, I can no longer perform activities requiring prolonged exertion or climb more

25      than a single flight of stairs.  (518).

26      MetLife's refusal to give credence to this evidence shows that MetLife did not conduct a full

27  or fair review.  It was MetLife's duty "to at least explain the basis for discrediting the subjective

28

1  complaints of the claimant.  If a decision maker fails to show some rational basis for his decision, a

2  reviewing court can only assume he has none." *Austin v. Continental Casualty Co.*, 216 F.Supp.2d

3  550, 558 (W.D. N.C. 2002).

4      **C.**   **MetLife Failed to Consider the Co-Morbidity Effects of Mr. Walker's Multiple**

5           **Conditions**

6      MetLife's piecemeal approach to Mr. Walker's claim disregards the co-morbidity[5] effect that

7  his multiple conditions have had in contributing to his disability.  Mr. Walker has several serious

8  conditions, including: type 2 diabetes for which he is insulin dependent, congestive heart failure,

9  pedal edema, diabetes neuropathy, macular degeneration and glaucoma.  As an example, MetLife

10 ignored the full effect of Mr. Walker's vision problem.  MetLife claimed that Mr. Walker has been

11 monocular (blind in one eye) his whole life and dismisses his complaints of blurred vision.

12 MetLife's analysis ignored the inevitable fact that any vision problems in the one healthy eye, even

13 episodes of blurry vision, would render Mr. Walker effectively blind in both eyes during such times.

14 More generally, MetLife made no effort to analyze Mr. Walker's symptoms stemming from the

15 medications, along with the pedal edema, and the diabetes and uncontrolled blood pressure.

16     Moreover, MetLife instructed its reviewers only to address their speciality, and not the

17 aggregate effect of Mr. Walker's multiple conditions.  Courts have found that this approach fails to

18 consider all the evidence and is an abuse of discretion.  In *Torgeson v. Unum Life Ins. Co. of*

19 *America*, 466 F.Supp.2d 1096, 1134 (N.D. Iowa 2006), the Court held:

20      Indeed, none of the questions posed for the medical reviewers asked or required them

21      to consider the co-morbid effects of any combination of conditions. . . . Thus, the

22      court concludes that Unum also ***abused its discretion by failing to perform an***

23      ***adequate co-morbidity review, where several conditions were supported by more***

24      ***than adequate evidence in the record***.

25

26

27

     _____

28      [5] Co-morbidity is "[a] concomitant but unrelated pathological or disease process." *Johnson v. Blue Cross and Blue Shield of Alabama*, 457 F.Supp.2d 1288, 1291, fn 8 (N.D. Ala. 2006).

1    *Id.* (Emphasis added). Similarly, MetLife abused its discretion by failing to perform a co-morbidity

2    review.

3       **D.**    **MetLife Relied On the Faulty Opinions of Biased Reviewers**

4           **1.**    **NMR Is Not Independent**

5       MetLife relied on the opinion of its own retained consultants as basis for the denial while

6    knowing full well that there was nothing "independent" about the medical review. The reviewers

7    were obtained through NMR which provides reviewers exclusively for administrators and insurers.

8    Courts have, on multiple occasions, seriously questioned the impartiality of NMR, noting that it is a

9    company MetLife uses extensively. *Austin*, 216 F.Supp.2d at 554, fn 1 ("It is clear [that NMR] is not

10   as 'independent' as Defendant asserts"); *Ladd v. ITT*, 148 F.3d 753, 755 (7th Cir. 1988) (NMR is a

11   consulting firm "that MetLife uses extensively."); *See also Black & Decker Disability Plan v. Nord*,

12   538 U.S. 822, 828 (2003), citing *Regula v. Delta Family-Care Disability Survivorship Plan*, 266

13   F.3d 1130 (9th Cir. 2001) (vacated on other grounds) (expressing concern over insurers repeatedly

14   hiring the same physicians as experts leaving physicians with incentive to protect their own

15   economic interests).

16         **2.**    **The Medical Reviewers Misstated the Record**

17       MetLife relied upon the faulty conclusions of Drs. Kelley, Rosenberg, and Turok. Dr. Kelley

18   opined that Mr. Walker was only disabled from his occupation from his last day of work through

19   October 24, 2005 based on Dr. Chuang's September 2005 note. (499, 502). Dr. Kelley grasped onto

20   the October 24, 2005 date despite the more recent Attending Physician's Statement by Dr. Chuang

21   on January 25, 2006 in which he advised that Mr. Walker could not return to work until July 16,

22   2006. (503, 549). There was no reason for Dr. Kelley to chose the earlier date when a subsequent

23   statement from Dr. Chuang was more timely and relevant. MetLife erred in relying on Dr. Kelley's

24   review to deny the claim and should have recognized that benefits were payable because Mr. Walker

25   was disabled through and beyond the elimination period. MetLife is not free to accept medical

26   reports without considering whether the conclusions therein follow logically from the underlying

27   medical evidence. *Abrams v. Cargill*, 395 F.3d 882, 887 (8th Cir. 2005).

28

1      Likewise, Dr. Turok completely misstated the record, claiming that Mr. Walker first

2   complained of blurred vision in March 2006, outside of the elimination period, when actually Mr.

3   Walker first complained of blurred vision in September 2005.  MetLife again relied upon a

4   conclusion which did not follow logically from the medical evidence.  *Id.*

5      MetLife's reliance Dr. Turok's opinion is also troublesome because according to his website,

6   Dr. Turok's practice is exclusively cosmetic surgery.  (Declaration of Elizabeth K. Green ("Green

7   Decl."), Exh. A, p. 1).  Dr. Turok's website (http://www.drturok.com/) describes Dr. Turok as a

8   "Cosmetic Surgeon" who specializes in "bringing back your youthful appearance," and procedures of

9   "Body Contouring" and "Facial Rejuvenation." (Green Decl., Exh. A, p. 1).  Dr. Turok's

10  involvement in cosmetic surgery does not appear to be a new venture as his website biography

11  claims that "It was during his Neurology residency that Dr. Turok first started using Botox™ for

12  reconstructive purposes over 20 years ago." (*Id.* at Exh. A, p. 2).  He also began laser resurfacing in

13  the early 1990s and liposuction since 1995. (*Id.*).  No experience in ophthalmology is listed.  It is

14  unknown when Dr. Turok last treated a patient for an ophthalmological condition but it appears that

15  he has no current practice in the field of ophthalmology.

16     Dr. Turok is a routine reviewer for disability carriers.  In *Audino v. Raytheon Co. Short Term*

17  *Disability Plan*, 129 Fed.Appx. 882, 884-885 (Tex. 2005), MetLife was found to have been arbitrary

18  and capricious when it denied disability benefits and relied upon the opinion of Dr. Turok.  Dr.

19  Turok appeared in several other published ERISA cases as the medical reviewer for MetLife – all

20  cases in which Dr. Turok's opinion supported nonpayment of benefits – which underscores his

21  allegiance to MetLife. *See Earnest v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1327, 1332 (M.D.

22  Fla. 2003); *Hill v. Metropolitan Life Ins. Co.*, 218 F.Supp.2d 128, 130 (D. Puerto Rico 2002); *Etkin*

23  *v. Merk & Co.*, 2001 WL 1346368, *2 (E.D. Pa. 2001).  Evidence that the insurer selects a medical

24  examiner on a routine basis is evidence of a conflict of interest.  *Austin,* 216 F.Supp.2d 550 (W.D.

25  N.C. 2002).  The Ninth Circuit has been critical of reports rendered by physicians retained by

26  insurers "as a matter of course." See *Welsh v. MetLife*, 229 F.3d 1161, *2 (9th Cir. 2000).

27

28

Case No. C 07-3772 WHA
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    MetLife also unabashedly adopted the reasoning of Dr. Rosenberg who deemed the Mr.

2    Walker would have neuropathy pain whether at home or at work, suggesting that he might as well

3    work with it.  However, the reason for disability insurance is so workers do not have to work *with*

4    *unmanageable pain* and are afforded the option to take time to recover and then return to work, if

5    possible.  MetLife's short-sighted view of disability suggests that it was not considering Mr.

6    Walker's best interests.

7        **E.    MetLife Ignored The Social Security Administration's Determination that Mr.**

8           **Walker Was Disabled From Any Work**

9        MetLife did not credit "reliable evidence" when it failed to consider the Social Security

10   Administration's ("SSA") determination that Mr. Walker was disabled from any work.  First, the

11   standard that must be met in order to qualify for SSDI is at least as stringent as the definition in the

12   Plan here.  42 U.S.C.A. § 423(d)(1)(A) ("inability to engage in any substantial gainful activity by

13   reason of any medically determinable physical or mental impairment which can be expected to result

14   in death or which has lasted or can be expected to last for a continuous period of not less than 12

15   months.").  And numerous Courts have agreed that, while a SSDI disability determination is not

16   binding on an ERISA fiduciary, it is significant evidence that a plan must take into consideration.  As

17   noted in *Calvert v. Firstar Finance*, 409 F.3d 286 (6th Cir. 2005):

18           Here, the SSA determination, at a minimum, provides support for the conclusion that

19           an administrative agency charged with examining Calvert's medical records found, as

20           it expressly said it did, objective support for Dr. Hester's opinion in those records.

21   *Calvert*, 409 F.3d at 294; *see also Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 215 (1st Cir.

22   2004) (SSA denial of benefits relevant to insurer's determination that claimant was not disabled);

23   *Riedl v. General American Life Ins. Co.*, 248 F.3d 753, 759 fn 4 (8th Cir. 2001) ("Although the

24   Social Security Administration's determination is not binding, it is admissible evidence to support an

25   ERISA claim for long-term disability benefits"); *Force v. Ameritech Corp., Inc.*, 452 F.Supp.2d 744,

26   750 (E.D. Mich. 2006) ("While the Social Security Administration's decision is not binding on the

27   Defendant, see *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832-33, 123 S.Ct. 1965, 155

28

1  L.Ed.2d 1034 (2003), such a determination is highly relevant, and cannot simply be ignored."); *See*

2  *also Pierce v. Kentucky Utilities Company's Long Term Disability Plan*, 357 F.Supp.2d 979, 989

3  (E.D. Ky. 2005) ("it is inconsistent for a plan administrator to completely ignore the Social Security

4  Administration's determination of disability, yet at the same time both demand the claimant apply

5  for Social Security benefits and utilize the Social Security decision to request reimbursement for

6  overpayment of benefits").

7      The Plan's complete failure to consider the SSDI award is evidence of conflict that should

8  diminish deference to MetLife's decision.

9  **VI.    Summary Judgment is Not Proper Because Plaintiff is Entitled to Obtain Evidence**

10      **Through Discovery That Supports Plaintiff's Claim that MetLife Abused its Discretion**

11      **A.    The Court May Consider Evidence Other Than the Claim File**

12      Plaintiff is entitled to discovery regarding MetLife's conflict of interest in denying Plaintiff's

13  claim for benefits. In *Abatie, supra*, 458 F.3d 955, the Ninth Circuit affirmed *Tremain v. Bell*

14  *Industries*, 196 F.3d 970 (9th Cir. 1999), and expressly held that **evidence *outside of the***

15  ***administrative record* is permitted in ERISA actions to aid the court in determining the**

16  **"nature, extent and effect" of an administrator's structural (inherent) conflict of interest on**

17  **the claims decision**. *Id.* at 970. Accordingly, Plaintiff may present evidence to the Court regarding

18  MetLife's conflict of interest, such as "any evidence of malice, of self-dealing, or of a parsimonious

19  claims-granting history," "inconsistent reasons for denial," inadequate investigation of a claim or

20  failing to ask the plaintiff for necessary evidence, failing "to credit a claimant's reliable evidence,"

21  and making decisions against the weight of evidence in the record. *Id.* at 968.

22      The Ninth Circuit's recent decision in *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942 (9th

23  Cir. 2007) reiterated *Abatie* by confirming a plaintiff's right to discovery in an ERISA case. In

24  *Welch*, the Ninth Circuit held that attorney fees are properly awarded for time spent conducting

25  discovery in an ERISA case:

26      Because an ERISA plaintiff may be permitted to supplement the administrative record

27      with evidence of a conflict of interest on the part of the defendant, see *Tremain v. Bell*

28

1    *Industries, Inc.*, 196 F.3d 970, 976-77 (9th Cir. 1999), we agree with Welch that *some*

2    discovery aimed at demonstrating a conflict of interest may have been appropriate.

3    *Welch*, 480 F.3d at 949-50.  Notably, the Ninth Circuit did not find that the plaintiff was first

4    required to demonstrate a conflict of interest in the administrative record before conducting

5    discovery.  In fact, the Ninth Circuit stated that a plaintiff is entitled to conduct discovery "*aimed* at

6    demonstrating a conflict of interest." *Id.* (emphasis added).

7        In the short time since *Abatie*, district courts in the Ninth Circuit have followed suit and

8    approved discovery requests by plaintiffs in ERISA cases.  *Groom v. Standard Ins. Co.*, 492

9    F.Supp.2d 1202 (C.D. Cal. 2007); *Harper v. Unum Life Ins. Co. of America*, 2007 WL 1792004, *5

10    (E.D. Cal. 2007); *Sterio v. Highmark Life Ins. Co.*, 2007 WL 1650929 (E.D. Cal. 2007); *Beckstrand*

11    *v. Electronic Arts Group Long Term Disability Ins. Plan*, 2007 WL 1599769, *5 (E.D. Cal. 2007)

12    ("discovery that would lead to evidence that, among other things, the plan had a record of denying

13    benefits, continuously retaining doctors who rendered opinions favorable to the plan, or had

14    standards or protocols with which the administrator complied . . . . Such evidence now goes to the

15    deference that the court will use in reviewing the merits of the case and, thus, is relevant and

16    admissible under *Abatie*");  *Starr v. MGM Mirage*, 2007 WL 1560335, *4 (D. Nev. 2007) ("Starr

17    may conduct the requested discovery to determine whether or not there is a conflict of interest, and if

18    so, the extent of that conflict"); *Linich v. Broadspire Services, Inc.*, 2007 WL 841509, *6 (D. Ariz.

19    2007) ("in light of Abatie, the Court finds that Plaintiff has a valid claim for discovery outside the

20    administrative record regarding the conflict of interest involved in this case"); *McCurdy v.*

21    *Metropolitan Life Ins. Co.*, 2007 WL 915177, *2 (E.D. Cal. 2007); *Liu v. Standard Ins. Co.*, 457

22    F.Supp.2d 1030, 1038 (C.D. Cal. 2006) (permitting depositions of the medical reviewers); *Baldoni*

23    *v. Unumprovident, Illinois Tool Works, Inc.*, 2007 WL 649295 at *6 (D. Or. 2007); *Gullidge v.*

24    *Hartford Life & Acc. Ins. Co.*, —F.Supp.2d—, 2007 WL 2362912, *2 (C.D. Cal. 2007) (hours

25    expended on discovery were reasonable because, under *Abatie* and *Welch*, "[s]ome discovery

26    regarding whether a conflict of interest existed is therefore appropriate if the plaintiff plans to raise

27    the issue of conflict of interest at trial, which Plaintiff in this case apparently did."); *Alvarez v. Unum*

28

1    *Life Ins. Co. of Am.*, 2007 WL 2348737, *7 (N.D. Cal. 2007) (granting Plaintiff's request for

2    discovery).

3         As explained above, MetLife failed to provide a full and fair review of Plaintiff's claim

4    before the denial of his claim.  Therefore, Plaintiff is entitled to discovery regarding whether

5    discretion was properly granted to MetLife by the welfare benefit plan, potential bias of NMR[6] and

6    the reviewing physicians, the extent of MetLife's conflict of interest regarding it medical reviews and

7    reliance on the opinion of Dr. Turok, a practicing cosmetic surgeon, for an ophthamology medical

8    review.  Plaintiff seeks to serve written discovery to MetLife, a subpoena for documents to NMR and

9    Dr. Rosenberg and Turok and possibly depositions of key individuals.  (Green Decl., ¶ 4).

10

11   **VII.    Conclusion**

12        For the foregoing reasons, Plaintiff respectfully requests that summary judgment be denied

13   and Plaintiff granted the right to conduct discovery.  Alternately, Plaintiff requests judgment entered

14   in his favor, for past benefits through the date of judgment, with interest; that his benefits be

15   reinstated on an ongoing basis; that his rights under the other defendant plans be reinstated; and that

16   he be allowed to file an appropriate motion for attorneys fees.

17

18   DATED: January 24, 2008                      KANTOR & KANTOR, LLP

19
                                          BY:    /s/ Elizabeth K. Green
20                                               ELIZABETH K. GREEN
                                                 ATTORNEYS FOR PLAINTIFF
21                                               DAVID WALKER

22

23

24

25

26   _____

27        [6] Attached as Exhibit "B" to Green Decl. are documents pertaining to NMR which were produced as part of Plaintiff's Initial Disclosures.  The documents reflect the past amounts MetLife has paid to NMR for medical reviews and other information concerning MetLife and NMR's

28   relationship.  Plaintiff seeks to obtain similar updated information from NMR.

Case No. C 07-3772 WHA
    PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**PROOF OF SERVICE**

STATE OF CALIFORNIA    )
                       )
COUNTY OF LOS ANGELES )

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 19839 Nordhoff Street, Northridge, CA 91324.

     On January 24, 2008, I served the foregoing document described as: PLAINTIFF'S REQUEST FOR TELEPHONIC APPEARANCE AT INITIAL CASE MANAGEMENT CONFERENCE on the interested parties in this action by serving a copy thereof  in a sealed envelope addressed as follows:

     Christopher J. Keller, Esq.
     Sedgwick, Detert, Moran & Arnold LLP
     One Market Plaza
     Steuart Tower, 8th Floor
     San Francisco, CA 94105

[X]    NOTICE OF ELECTRONIC FILING

[ ]    (BY MAIL)  I deposited such envelope in the mail at Northridge, California. The envelope was mailed with postage thereon fully prepaid.

[ ]    As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Northridge, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]    (BY FAX)  I faxed such document to the facsimile number above following regular business practices.

[X]    (BY PERSONAL SERVICE)  I caused hand delivery of such envelopes to the office of the addressee so indicated.

[ ]    (STATE) I declare under penalty of perjury under the Laws of the State of California that the foregoing is true and correct.

[X]    (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

     Executed on January 24, 2008, at Northridge, California.


                         /s/ Denise Anderson
                         Denise Anderson