1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   REBECCA A. HULL  Bar No. 99802
2  CHRISTOPHER KELLER  Bar No. 178491
   One Market Plaza
3  Steuart Tower, 8th Floor
   San Francisco, California 94105
4  Telephone: (415) 781-7900
   Facsimile: (415) 781-2635
5

6  Attorneys for Defendants

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

   David Walker,                          CASE NO. C 07 3772 WHA
11
              Plaintiff,                   **DEFENDANTS METROPOLITAN LIFE**
12                                         **INSURANCE COMPANY AND KAISER**
                                           **PERMANENTE FLEXIBLE BENEFITS**
13         v.                              **PLAN'S REPLY IN SUPPORT OF**
                                           **MOTION FOR SUMMARY JUDGMENT**
14  Metropolitan Life Insurance Company,
    Kaiser Permanente Flexible Benefits Plan,
15  et al.,
                                           **DATE:  FEBRUARY 14, 2008**
16            Defendants.                  **TIME: 8:00 A.M.**
                                           **COURTROOM: 9**
17                                         **JUDGE:  HONORABLE WILLIAM ALSUP**

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2
**PAGE**

3  I.      INTRODUCTION................................................................................................1

4  II.     THE EVIDENCE BEFORE THE COURT.........................................................2

5          A.      The Plan's Grant of Discretion ...............................................2

6          B.      The Medical Evidence ...............................................................3

7  III.    PLAINTIFF'S OPPOSITION............................................................................6

8  IV.     LEGAL AUTHORITY AND ARGUMENT .....................................................7

9          A.      Introduction .................................................................................7

10         B.      The Plan Granted Discretion to MetLife ...............................8

11         C.      MetLife's Decision Was Not an Abuse of Discretion ..........10

12         D.      Plaintiff Has Not Made a Rule 56(f) Showing ......................12

13         E.      Defendants Are Entitled to Judgment ....................................14

14  V.     CONCLUSION..................................................................................................15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Abatie v. Alta Health & Life Ins. Co.*,
  458 F.3d 955 (9th Cir. 2006) ................................................................. 9, 10

*Bendixen v. Standard Ins. Co.*,
  185 F.3d 939 (9th Cir. 1999.) .................................................................. 7, 8

*Black & Decker v. Nord*,
  538 U.S. 822 (2003) .................................................................................. 12

*Cagle v. Bruner*,
  112 F.3d 1510 (11th Cir. 1997) ............................................................... 10

*Chadwick v. Metropolitan Life Ins. Co.*,
  498 F. Supp. 2d 1309 (E.D. Cal. 2007) ................................................... 14

*Crume v. Metropolitan Life Ins. Co.*,
  417 F. Supp. 2d 1258 (M.D. Fla. 2006) .............................................. 11, 12

*Daic v. Metropolitan Life Ins. Co.*,
  458 F. Supp. 2d 1167 (D. Hi. 2006) ......................................................... 10

*Davis v. Unum Life Ins. Co.*,
  444 F.3d 569 (7th Cir. 2006) ...................................................................... 5

*Disanto v. Wells Fargo & Co.*,
  2007 WL 2460732 (M.D. Fla. August 24, 2007) ..................................... 14

*Ford v. Motorola Inc. Involuntary Severance Plan*,
  2007 WL 162680 (D. Az. January 18, 2007) ........................................... 13

*Harper v. Unum Life Ins. Co.*,
  2007 WL 1792004 (E.D. Cal. 2007) ........................................................ 13

*Jordan v Northrop Grumman Corp. Welfare Benefit Plan*,
  63 F. Supp. 2d 1145 (C.D. Cal. 1999) ..................................................... 15

*Martin v. Continental Cas. Co.*,
  96 F. Supp. 2d 983 (N.D. Cal. 2000) ....................................................... 15

*Mongeluzo v, Baxter Travenol Long Term Disability Benefit Plan*,
  46 F.3d 938 (9th Cir. 1995) ...................................................................... 14

1

**Table of Authorities**
**(Continued)**

2

**PAGE**

3

*Rodriguez-Abreu v. Chase Manhatten Bank, N.A.*,
    986 F.2d 580 (1st Cir. 1993)............................................................................9

4

5

*Semien v. Life Ins. Co. of North America*,
    436 F.3d 805 (7th Cir. 2006) ........................................................................15

6

7

*Shane v. Albertson's Inc. Employees' Disability Plan*,
    381 F. Supp. 2d 1196 (C.D. Cal. 2005).........................................................9

8

*Shemano-Krupp v. Mutual of Omaha Ins. Co.*,
    2006 WL 3365595 (N.D. Cal. November 20, 2006).....................................13

9

10

*Taft v. Equitable Life Assur. Soc'y*,
    9 F.3d 1469 (9th Cir. 1993) ............................................................................8

11

12

**STATUTES**

13

29 U.S.C. section 1002(21)(A)................................................................................9

14

29 U.S.C. section 1105(c) .......................................................................................9

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

Defendants Metropolitan Life Insurance Company ("MetLife") and Kaiser Permanente Flexible Benefits Plan ("Plan") moved for summary judgment on the ground that the terms of the Plan, the administrative record of the long term disability ("LTD") claim of plaintiff David Walker, and the applicable law, together entitle them to judgment.  Defendants' motion shows that (1) MetLife is the Plan's claim administrator for LTD benefits, (2) MetLife carries out its duties under a grant of discretion, and (3) MetLife did not abuse its discretion in denying the claim.  MetLife adjudicated the claim only after extensive and thorough reviews of the relevant records, including fruitless attempts to discuss the case with plaintiff's doctor, whose records did not substantiate plaintiff's reports to MetLife about his asserted limitations.

Plaintiff confuses matters through unsupported contentions.  His arguments rely on his and his attorneys' lay opinions about medical issues, rather than on his doctors' records.[1]  He is not a doctor, or medically trained (he is a computer technician), and his personal opinions were in conflict with with his doctors' contemporaneous records.  Therecords did not validate his lay opinions, substantiate functional limitations he claimed were disabling him from his occupation.[2]

It was not an abuse of discretion for MetLife to credit opinions of medical specialists who reviewed plaintiff's records and opined that he was not functionally precluded from working in his occupation, given the medical tests, history and examination results documented in plaintiff's records.  MetLife was not required to defer to plaintiff's lay opinions about such matters.

---

[1] *See*, *e.g.*, Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Opp."), at 4:18-5:24.  The arguments refernce the administrative record, but the cited portions are references to plaintiff's statements and arguments, not references to his doctors' medical records.  *See also* Opp. 7:23, 9:6-7, citing letters written by plaintiff's *attorneys* (ADMIN 237, 261-62) as consituting evidence of alleged side effects of medications – a contention that is not supported by the medical records, as discussed below.

[2] On multiple occasions (especially as to the claimed visual impairment), doctors' records were contrary to plaintiff's statements.  He argues that he had "severely impaired" vision starting mid-2005, but an eye examination September 21, 2005 (after complaints of blurred vision on September 15, six days earlier) showed visual acuity of 20/25; Dr. Chuang noted on October 11, 2005, that plaintiff's vision continued to be "stable," and observed that he had a 25-year history of diabetes with retinopathy, "but stable."  *See* ADMIN 560, *cf.* ADMIN 543, 562.

II.    **THE EVIDENCE BEFORE THE COURT**

Plaintiff's Opposition ignores the terms of the Plan and his doctors' tests and records, and repeatedly makes arguments that are unsupported.  A brief review of the record evidence is required in order to place such arguments in their proper evidentiary context.

A.    **The Plan's Grant of Discretion**

The umbrella plan document, entitled "Kaiser Permanente Welfare Benefits Plan," conclusively demonstrates that the Plan confers discretion on MetLife.  (ADMIN 7.)  It states:

> 4.1    Named Fiduciaries.  The named fiduciaries with respect to each Plan, for purposes of ERISA, shall be the Employers whose employees participate in such Plan.  With respect to each **Program in which benefits are provided under a Contract in which the Insurer is responsible for review of the benefit claim determination,** such Insurer is the named fiduciary with respect to such determinations, pursuant to ERISA Regulation § 2560.503-1(g)(2).
>
> 4.2    Allocation and Delegation of Fiduciary Responsibility.
>
> a.    Each named fiduciary is allocated fiduciary responsibility with respect to the specific discretionary authority exercised by it, under the **Contract(s) relating to the Program(s) in which such Named Fiduciary participates**.
>
> 4.3    Discretionary Authority of Fiduciaries.  Each named Fiduciary . . . shall have full and complete authority with respect to its responsibilities under the Plan **and any Program hereunder**.  All actions, interpretations, and decisions of a National Fiduciary . . . shall be conclusive and binding on all persons and shall be given the maximum possible deference allowed by law.

(ADMIN 7 [emphasis added])

Programs that are covered by the Kaiser Permanente Welfare Benefit Plan document are set out in Appendix A.  (ADMIN 13)  Appendix A shows "Metropolitan Life Insurance Company Contract  95910, 95911" as a Program covered by this plan document.  (*Id*.)  The plan document entitled "Kaiser Permanente Benefits for You . . . November 2003 Summary Plan Description" (ADMIN 014-175) identifies MetLife as "the insurer and third party administrator for . . . Long-Term Disability insurance" (ADMIN 163) and as "the administrator for Long-Term Disability claims" (ADMIN 164), and discloses that LTD benefits are insured by MetLife, with "insured" administration, funded through insurance contracts.  (ADMIN 160.)  MetLife, the LTD claim administrator, determined in its discretion that plaintiff was not disabled under the Plan, and

1  therefore was not eligible for Plan benefits.  Plan documents identify MetLife as the entity that

2  makes such decisions. (ADMIN 7, 13, 163-64.)

3      **B.    The Medical Evidence**

4      Plaintiff's claim was denied because his records did not establish a functional impairment

5  continually existing during the Plan's six-month elimination period and beyond.[3]  His January 4,

6  2006, claim identified his disabling condition as cardiac problems and blood pressure problems,

7  shortness of breath, chest pains, and insufficient stamina to walk.  (ADMIN 576.)  An Attending

8  Physician Statement ("APS") by Dr. Chuang (the initial medical support for the claim) identified

9  the disabilities as shortness of breath, cardiomyopathy and hypertension.  (ADMIN 588-89.)

10      Plaintiff's employer also submitted information, dated January 31, 2006, establishing his

11  job duties.  (ADMIN 568-71.)  The Supervisor Statement shows the job consisted primarily of

12  sitting (five to six hours per day), with some walking, standing, bending, twisting and crouching,

13  occasional lifting, but no climbing, kneeling, balancing, pushing, pulling or heavy lifting.  (*Id.*)

14      On March 1, 2006, in an interview with MetLife, plaintiff added new allegedly disabling

15  conditions that were not in his claim or in Dr. Chuang's APS:  diabetes and glaucoma.  (ADMIN

16  178.)  He revealed that he did not plan to return to work, claiming that he could not do so

17  because of side effects of his medication.  (*Id.*)  MetLife immediately ordered his medical records

18  for the period from August 2005 to March 1, 2006.  (*Id.*)

19      On April 10, after review of the medical records, MetLife called plaintiff.  (ADMIN 180.)

20  During the call, plaintiff brought up allegedly disabling conditions that were not identified in his

21  claim or in the APS:  blurred vision, and decreased strength in his arms and legs.  (*Id.*)  He said

22  that he was treated only by Dr. Chuang, who controlled cardiac issues with medication, and said

23  he was taking Lasix for swollen ankles ( *i.e.*, pedal edema), but not being treated for anything

24  else.  (ADMIN 180-82.)  He claimed that sitting at a computer was only a "small part" of his job,

25  saying he had to lift and carry computers, crawl on the floor, climb up to ceilings, and pack

26

27      [3] Defendants will not burden the Court with repetition of matters addressed in moving papers, but will refer the Court to relevant parts of their opening brief ("MSJ Brief").  A participant must

28  be totally disabled continuously during the entire elimination period.  *See* MSJ Brief, p. 4.

1   computer equipment.  (ADMIN 180.)  Plaintiff was informed during the April 10 call that his

2   records would be reviewed by a physician.  (ADMIN 181.)

3       On April 19, plaintiff called MetLife and added another allegedly disabling condition,  not

4   found in his claim or in the APS:  macular degeneration and blurred vision.  (ADMIN 183.)  He

5   wrote to MetLife on April 20, saying that he had been referred to specialists for evaluation of

6   vision issues and claiming that one, Dr. Blum, found that his vision was being affected by his

7   medications.  (ADMIN 535.)[4]  He was told his file would be updated.  (ADMIN 183.)

8       Dr. Kelley, an independent physician consultant ("IPC") who is a board certified internist,

9   issued a report on April 19, assessing the medical records and plaintiff's functional ability as

10  reflected in the records.  (ADMIN 499.)  She asked that her report be sent to Dr. Chuang for his

11  response, and included a list of questions to be answered by Dr. Chuang.  (*Id.*)[5]  The April 19

12  report opined that plaintiff was functionally impaired from August 20, 2005, through October 24,

13  2005.  (ADMIN 184, 531).  Dr. Kelley further opined, however, that plaintiff was able to function

14  in his occupation subsequent to October 24, 2005. (ADMIN 184, 531).

15      Plaintiff submitted a Personal Profile with multiple attachments, on April 27, 2006,

16  claiming that as of August 2005 he was disabled by vision problems.  (ADMIN 511-25; *see*

17  ADMIN 517-18.)  His records from Dr. Blum, who evaluated him in March 2006 for blurred

18      [4] Plaintiff later provided a release for Dr. Blum's records; when obtained, they included a list

19  of his medications, but did not support his claim that Dr. Blum had found that his medications
    caused the reported vision problems.  (ADMIN 465-90.)

20      [5] Dr. Kelley requested that Dr. Chuang answer the following questions:

21      1.      At this point, what do you feel is the etiology of [plaintiff's] shortness of breath?
        What is the planned treatment?

22      2.      Has the patient seen a pulmonary physician?  Was a diagnosis given?

23      3.      How severe is the claimant's cardiomyopathy?  The tests suggest that his cardiac
        condition has been stable and not likely contributing to his dypsnea.  Please comment.

24      4.      Has a cause been found for the patient's complaint of fatigue?

25      5.      How is your patient's vision?  Any decline in vision recently?  Any treatment
        planned?

26  (ADMIN 499.)  Dr. Chuang did not directly respond to these questions, although Dr. Kelley's

27  report was sent to him, with a request for response, on April 27, 2006.  (ADMIN 508; *cf.* 494.)
    The suggestion that Dr. Chuang did not read what was sent to him (Opp. p. 8) is unsupported,

28  and is irrelevant to the question of whether MetLife abused its discretion in crediting Dr. Kelley.

1  vision, show that Dr. Blum's diagnosis was <u>not</u> (as plaintiff told MetLife on April 19) that his

2  medications were at fault, but was that he needed (1) stronger corrective lenses, and (2) a retinal

3  specialist.  (ADMIN 468.)[6]  The argument (Opp. p. 6) that Dr. Blum attributed plaintiff's vision

4  problem to effects of his medications is contrary to the medical records.  (ADMIN 535.)

5        MetLife reviewed plaintiff's records in June 2006 and, crediting Dr. Kelley's opinion,

6  found him ineligible for Plan benefits because his records did not show functional inability to work

7  during the entire elimination period and thereafter.[7]  (ADMIN 188-89, 492.)  He appealed the

8  denial, offering additional materials as support for his arguments on appeal.

9        MetLife, as required by ERISA regulations, referred the file to an independent medical

10  referral bureau, National Medical Review (www.nmrusa.com) ["NMR"],[8] for physician reviews

11  and answers to specific questions, from members of NMR's physician panel with appropriate

12  areas of specialization.[9]  (ADMIN 252.)  NMR referred the file to an IPC (Dr. Rosenberg) who is

13  board certified in internal medicine, cardiology and interventional cardiology, and is an Assistant

14  Clinical Professor of Medicine (ADMIN 246), and also to an IPC (Dr. Turok) who is board

15  certified in neurology and ophthalmology, and is an Adjunct Clinical Instructor.  (ADMIN 250.)

16

17  [6] The retinal specialist, Dr. Jones, performed a laser procedure in May 2006 at which time plaintiff's vision was 20/40 (ADMIN 288); by August, his vision was 20/20.  (ADMIN 294.)

18  [7] Dr. Kelley opined that plaintiff was disabled only until October 24, 2005.  (ADMIN 188.)

19  [8] Plaintiff's dismissal of NMR as "a company providing medical reviews solely for insurance

20  companies" or "exclusively for administrators and insurers" is unsupported, and the fact that the IPCs did not personally examine him is irrelevant.  (Opp. at 8:2-4; *see* Opp. 16:7)  *See, e.g.,*

21  *Davis v. Unum Life Ins. Co.*, 444 F.3d 569 (7th Cir. 2006), rejecting an argument that ERISA precludes administrators from crediting opinions of physicians based on file reviews rather than

22  personal examination, finding no prohibition on "the commonplace practice of doctors arriving at professional opinions after reviewing medical files."  *Id*. at 577.  "In such file reviews, doctors are

23  fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation."  *Id*.

24  [9] Plaintiff's claim that it was improper for MetLife to have doctors with different specialties

25  evaluate his file is illogical.  *See* Opp. p. 15:16-17 ("MetLife instructed its reviewers only to address their specialty, and not the aggregate effect of Mr. Walker's multiple conditions.")  His

26  assertion is not supported by a record cite, and is contrary to the record.  MetLife told NMR to refer the file to appropriate specialists to evaluate issues within their specialty (*see* ADMIN 252),

27  but <u>all</u> of the records were reviewed by <u>each</u> IPC (*i.e.*, Dr. Rosenberg's report lists records from the eye doctors, and Dr. Turok's report lists records from the internists and other physicians).

28

1    Drs. Rosenberg and Turok[10] provided detailed analyses of the records, opining that they

2    do not support the claimed functional limitations.  (ADMIN 243, 247.)  Both IPCs responded (in

3    question 7) to MetLife's specific inquiry about side effects of medications, each opining that the

4    records did not support that medications limited plaintiff's functionality.[11]  (*See also* ADMIN

5    220.)  Dr. Rosenberg provided two supplemental reports.  (ADMIN 220, 227.)  His May 2007

6    report, following a conclusory letter from Dr. Chuang (ADMIN 238) ambiguously stating that

7    plaintiff's retinopathy "is problematic" and "will only get worse," describes his futile attempts to

8    speak with Dr. Chuang.  (ADMIN 227.)   The original determination was upheld.  (ADMIN 213.)

9    **III.    PLAINTIFF'S OPPOSITION**

10    Plaintiff argues that:  (1) the Plan did not confer discretion on MetLife, and denial of the

11    claim should be reviewed *de novo*; (2) reviewing doctors "ignored" or "failed to credit" reliable

12    information supporting plaintiff's claimed functional impairment, and MetLife thus abused its

13    discretion in crediting their reports; (3) reviewing doctors, and/or the medical referral agency,

14    and/or MetLife, were biased against plaintiff, and denial of the claim therefore should be reviewed

15    with skepticism; and (4) the Court should defer ruling on defendants' motion and permit plaintiff

16

17    [10] Plaintiff's criticism of Dr. Turok (based on inadmissible documents of unverified origin, to
18    which defendants object for lack of foundation, and lack of relevance) is simply puzzling.  The
      very documents he offers for review by the Court appear, if they could be authenticated, to
19    substantiate the same medical qualifications indicated on Dr. Turok's report.  (ADMIN 250.)  It is
      to be expected that physicians who sometimes do medical reviews as NMR panelists have other
20    professional activities – if a physician's sole activity was preparation of reports for NMR, plaintiff
      would criticize him or her as beholden to NMR.  Plaintiff's point is unclear; he seems to say that if
21    MetLife receives a report, it should do a Google search on the IPC and reject reports based upon
      an undefined standard to be applied to the IPC's professional activities, but he offers no law or
22    logic as a basis to fault MetLife for accepting and crediting Dr. Turok's report.

23    [11] This conclusion is consistent with plaintiff's medical records (albeit contrary to his personal
24    opinion) which did not document any disabling side effects of his medications.  The claim that the
      IPCs were not given information about his medications (Opp. p. 9) is contrary to the record
25    (ADMIN 253-54, detailing records submitted with referral, including "extensive medical literature
      from the internet regarding [employee's] medications").  His submission was not in any event
26    particularly probative; many medications have *possible* side effects, but not all patients experience
      all of them and many possible side effects are experienced by few patients – thus, the relevant
27    information about side effects of plaintiff's medications would be that which is in his medical
28    records – which do not support his arguments.

1   to conduct vaguely described discovery for unstated purposes (which he suggests could, in an

2   unspecified manner, affect the standard of review).  Plaintiff is wrong on all points, and his

3   arguments must be rejected.

4          First, the Plan expressly conferred discretionary authority on MetLife.  Plaintiff's strained

5   argument for *de novo* review is contradicted by the Plan documents.

6          Second, the IPCs reviewed plaintiff's records meticulously (Dr. Rosenberg issued three

7   reports over five months), and credited those records (which showed, for example, that plaintiff's

8   vision was 20/25 in September 2005 a month after he stopped working, was "stable" by October

9   2005, was 20/20 in August 2006, and not remarked upon thereafter).  What the IPCs did <u>not</u>

10  credit, however, were (1) unfounded statements by plaintiff, which were contrary to the results of

11  his tests and medical examinations as reflected in treating doctors' records,[12] and (2) the vague,

12  conclusory statements by Dr. Chuang (ADMIN 238) in support of the claim.

13         Third, nothing that plaintiff offers in his opposition indicates a bias against him.  The

14  unauthenticated and inadmissible documents from other cases, attached to the Declaration of

15  Elizabeth Green, and case citations regarding unrelated claims and plans, and disparate facts, have

16  no logical bearing on this plaintiff's claim, or on the propriety of the decision in issue here.

17         Fourth, plaintiff has not made a showing under Federal Rule of Civil Procedure 56(f) such

18  as to warrant delaying a decision on defendants' motion pending unspecified discovery which

19  plaintiff proposes to conduct for unknown reasons and with unknown objectives.

20  **IV.    LEGAL AUTHORITY AND ARGUMENT**

21         **A.    Introduction**

22         When a fiduciary's claim decision is reviewed for abuse of discretion, "a motion for

23  summary judgment is merely the conduit to bring the legal question before the district court and

24  the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do

25  not apply." (*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999.)  A court is not

26

27         [12] Notably, *none* of plaintiff's treating doctors *ever* recorded a diagnosis that side effects of
    medications were disabling, yet he argues that MetLife abused its discretion by "ignoring" his
28  "evidence" about that – citing statements <u>by plaintiff and his attorneys</u>.  *See* p. 1, n.1, *supra.*

1    permitted to substitute its judgment for that of the fiduciary, unless the decision was clearly

2    erroneous in light of the available record, or there was no reasonable basis for it.  (*Id*. at 944.)

3        As discussed below, the appropriate standard of review in this Court is abuse of

4    discretion.  Where, as here, there is relevant evidence "that reasonable minds might accept as

5    adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from

6    the evidence, the decision must be upheld" on review. *Taft v. Equitable Life Assur. Soc'y*, 9 F.3d

7    1469, 1473 (9th Cir. 1993).  On the evidence, MetLife did not abuse its discretion.

8                    **B.    The Plan Granted Discretion to MetLife**

9        The argument that the Plan purportedly does not grant discretion to MetLife is difficult to

10   follow.  As set out above, the Plan <u>expressly</u> confers discretion on MetLife, and also identifies it

11   as the entity charged with making the type of decision in issue here.  (*See* ADMIN 7, 13, 163-64.)

12   Plaintiff's argument seems to be that there was no grant of discretion applicable to MetLife,

13   because the funding contract is not in the record and that the failure to put the funding contract

14   into the record somehow vitiates the express grant of discretion in the plan documents.  His

15   argument is not logical, is contrary to the evidence, and is not supported by applicable law.

16       Plaintiff says that a statement in the MSJ Brief that LTD benefits are funded by a MetLife

17   insurance policy is not supported by the record.  Opp. p. 10.  In fact, the record shows that LTD

18   benefits are "insured," and that the "type of administration" for benefits is "insured," and that the

19   "funding medium" is "insured agreement premiums paid from general assets."  (ADMIN 160.)

20       Although the SPD discloses that LTD benefits are funded by an "insured agreement" and

21   that the "type of administration" is "insured," plaintiff argues that "there is no contract between

22   MetLife and Kaiser."  Opp., p. 10.  From that erroneous premise, he reasons that although Plan

23   documents specifically disclose that (1) LTD benefits are insured, (2) MetLife decides LTD claims

24   and (3) one Program under the Plan is the MetLife contract, nevertheless MetLife is not within a

25   Plan provision that states, "With respect to each Program in which benefits are provided under a

26   Contract in which the Insurer is responsible for review of benefit claim determinations, such

27   Insurer is the named fiduciary . . . ."  (ADMIN 7.)  The contention that some tertiary level of

28   parsing of the underlying funding documents is required in order for the Plan to have conferred

1    discretion upon MetLife regarding claim decisions is simply wrong.  First, the Plan itself is quite

2    clear:  if benefits are insured and an insurer makes claim decisions – as is indisputably the case

3    here, and as the SPD discloses is the case – the insurer has discretionary authority as to the

4    decisions.  Second, the statute to which he alludes (29 U.S.C. § 1105(c)) does not apply here.

5        Section 1105 applies when a fiduciary wishes to divest itself of liability for actions of a

6    cofiduciary.  To do so, certain formalities must be observed.  Here, however, there is no issue of

7    one fiduciary disclaiming liability for the actions of another, and the statute has no application.

8    Plaintiff's cited authorities likewise have no application; they involve situations where a plan

9    granted *exclusive* discretionary authority to one entity, and the issue was whether a different

10   entity's decision was covered by that grant.  *See Shane v. Albertson's Inc. Employees' Disability

11   Plan*, 381 F.Supp.2d 1196 (C.D. Cal. 2005); there, the question of "whether or not Total

12   Disability exists" was to be determined by trustees "in their sole and absolute discretion."  381

13   F.Supp.2d at 1200 (emphasis deleted).  The *Shane* court concluded that the plan did not grant

14   discretion to anyone other than trustees and thus decisions by a third party were covered in the

15   absence of evidence of a delegation of the trustees' exclusive discretion.  *Id.* at 1203.  The same

16   is true of *Rodriguez-Abreu v. Chase Manhatten Bank, N.A.*, 986 F.2d 580 (1st Cir. 1993).

17       Here, however, there *was* a delegation of discretionary authority to insurers (one of which

18   was MetLife) who determine benefits under contracts of insurance (as MetLife did).[13]  Plaintiff's

19   argument fails to take account of the Ninth Circuit's reminder, in *Abatie v. Alta Health & Life

20   Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), that no "magic words" are required in order for fiduciaries

21   to have discretion, and that the issue of discretion must be resolved from plan documents viewed

22   as a whole.  Because the Plan confers discretion, this Court should review MetLife's decision

23

24   [13] The assertion the MetLife is not a fiduciary at all (Opp. 11:1) is even further off the mark.
     Under ERISA, a fiduciary is any person who exercises discretionary authority over a plan or its
25   assets.  "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any
     discretionary authority or discretionary control respecting management of such plan or exercises
26   any authority or control respecting management or disposition of its assets . . . or (iii) he has any
     discretionary authority or discretionary responsibility in the administration of such plan. . . ."  29
27   U.S.C. § 1002(21)(A).  Thus, by reason of its exercise of control over benefits (Plan assets) and
     benefit decisions, MetLife is a fiduciary as a matter of black letter law.
28

1    against an abuse of discretion standard.  *Abatie*, 437 F.3d at 965.[14]

2           **C.     MetLife's Decision Was Not an Abuse of Discretion**

3           Plaintiff argues that MetLife abused its discretion by crediting the IPCs' reports, because

4    the reports purportedly are "faulty" and "biased" and because MetLife allegedly acted improperly

5    in using NMR as a referral bureau.  Again, his arguments must be rejected.

6           Defendants do not dispute that plaintiff had medical conditions.  However, the bare fact

7    that a Plan participant has health issues does not establish eligibility for benefits under the Plan.

8    Rather, a participant's medical condition must result in functional impairments sufficient to render

9    him "Disabled" under the Plan.  The medical evidence submitted by plaintiff, his physicians and his

10   attorneys failed to establish that he was functionally impaired from performing his own occupation

11   throughout and after the elimination period.  As a result, he did not meet the Plan's definition of

12   disability and was not entitled to benefits under the Plan.

13          The argument that the reports had "faulty conclusions" is based on sweeping assertions

14   that MetLife should have been more critical of them.  Plaintiff claims that Dr. Turok's report

15   should have been rejected because he did not comment that in mid-September 2005 plaintiff

16   complained to Dr. Chuang about "blurred vision," which had cleared by the time of an eye exam

17   six days later (after which Dr. Chuang's records noted "vision stable").  He does not explain how

18   MetLife abused its discretion in crediting Dr. Turok's report simply because it did not mention a

19   complaint that cleared up in *six days*, and thereafter was "stable," according to his records.

20          Plaintiff similarly argues that Dr. Kelley should not have relied on Dr. Chuang's records of

21   September–October 2005, although she was charged with evaluating functional limitations during

22   the elimination period (that is August 2005 to February 2006), claiming that she should have

23   looked only at the January 2006 APS.  (Opp. pp. 16-17; *but see* ADMIN 560, *cf.* ADMIN 543,

24   562.)  He cannot explain why Dr. Kelley's report supposedly should have been rejected for

25   discussing, evaluating and relying upon contemporaneous records for the period in issue.

26   ───────────────

27          [14] *See also Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997) [grant of discretion need
     not appear in particular plan document to be effective, if found in any plan document]; *Daic v.*
28   *Metropolitan Life Ins. Co.*, 458 F. Supp. 2d 1167 (D. Hi. 2006) [same].

1    Further, plaintiff argues that MetLife did not make a "full and fair" review of his claim,

2    given its alleged failure to consider the effects of his medications.  Again, the record is otherwise.

3    As discussed above, the IPCs were <u>expressly</u> directed to consider potential impact of plaintiff's

4    medications, and given copies of his submissions on that subject.  Plaintiff's problem is not that

5    the IPCs did not consider effects of medication, but that they did not support his argument that

6    medications were disabling him.  Moreover, despite <u>plaintiff's</u> argument that medications caused

7    disabling side effects, his <u>doctor's records</u> do not support his claim – for instance, he represented

8    to MetLife that Dr. Blum had diagnosed his medications as a cause of blurred vision, but records

9    of Dr. Blum show only a finding that plaintiff needed a stronger prescription for corrective lenses

10   anda retinal consultation – and the latter resulted in a procedure that gave him <u>normal</u> vision.  Had

11   there been problems due to his medications, there would have been indications in his records, with

12   notations about attempts to correct such problems – but there are none.

13   Additionally, plaintiff complains that MetLife did not credit "reliable evidence, including

14   Dr. Chuang's letters describing the functional limitations" that allegedly disabled him, as well as

15   plaintiff's subjective complaints.  Opp., p. 12.  Dr. Chuang's letters, however, were conclusory in

16   the extreme.  He merely said that plaintiff's "ophthalmologic involvement (diabetic retinopathy) is

17   problematic for him to function normally.  His retinopathy will only get worse."  (ADMIN 238.)

18   This uninformative statement does not establish even the existence, much less the degree, of a

19   functional incapacity plaintiff supposedly was experiencing.  Rejection of an unsupported

20   conclusion is not improper.  *See Crume v. Metropolitan Life Ins. Co*., 417 F. Supp. 2d 1258

21   (M.D. Fla. 2006), where the plaintiff challenged denial of a claim that she was disabled by bipolar

22   disorder.  Her records were reviewed by psychiatrists who opined that they did not substantiate an

23   impairment causing a functional limitation precluding her from working.  *Id.* at 1262-63, 1266-68.

24   The court further held that the claim administrator, in crediting the reviewing doctors' opinions,

25   did not thereby arbitrarily refuse to consider a treating physician's diagnosis:

26       First, [the treating doctor's] bipolar disorder diagnosis did not constitute "reliable
         evidence"; **there was no objective support for that diagnosis**.  Second, it is
27       abundantly clear that MetLife did **consider** Dr. Berns' diagnosis, but rejected it.  It
         was within MetLife's province to do so.
28

1   *Id.* at 1276 (emphasis added).  Here, rejection of Dr. Chuang's conclusory assertion of disability,

2   and rejection of plaintiff's lay opinions (which medical records did not bear out)[15] likewise was

3   not rejection of "reliable evidence."  Plaintiff also suggests, in an effort to bring himself within

4   cases on pain syndrome disability, that the issue is the impact of pain prescriptions.  (*See* Opp.

5   14:3-5; 18:3-5 ["the reason for disability insurance is so workers do not have to work *with*

6   *unmanageable pain* and are afforded the option to take time to recover and then return to work,

7   if possible" (emphasis original)].)  His records **do not show** that he was taking pain medication,

8   however, nor do they show a history of "unmanageable pain."

9        Finally, plaintiff argues that the award of Social Security benefits is "reliable evidence" of

10  disability under the Plan.  This point is discussed in defendants' motion, at MSJ Brief pp. 20-21.

11  Nothing in the record suggests that MetLife "failed to consider" the Social Security award – but

12  nothing in the law required MetLife to accept it as proof of eligibility for Plan benefits.  In fact,

13  the Supreme Court held otherwise in *Black & Decker v. Nord*, 538 U.S. 822, 825 (2003) ["Plan

14  administrators are not obligated to accord special deference to the opinions of treating

15  physicians"].  Unlike the Social Security Administration, the Plan and its claim administrator are

16  not required to follow a treating physician rule, and are not bound by a determination issued by

17  that agency.  The Social Security Administration's determination is separate from, and governed

18  by a different standard from, claim adjudications under the Plan.  The decision on plaintiff's claim

19  for Plan benefits was appropriate, and that result is not called into question by his receipt of Social

20  Security benefits.  Accepting his position would require that private disability benefits be adjudged

21  coextensive with Social Security disability benefits.  *Nord* holds to the contrary.

22       **D.    Plaintiff Has Not Made a Rule 56(f) Showing**

23       Under Federal Rule of Civil Procedure 56(f), the Court may order continuance of a

24  dispositive motion to permit discovery to be conducted, if the party opposing the motion has

25  established by affidavit that "for specified reasons" (formerly, "for reasons stated") he cannot

---

27  [15] The argument that plaintiff "*and his doctors* attributed many of his symptoms" to his
    medications (Opp. 14:11-12 [emphasis added]) is not supported by the record.  Plaintiff *and his*
28  *attorneys* made those arguments – but the medical records *do not* contain such findings.

1   present facts "essential to justify" opposition.  Plaintiff fails to make any showing, other than that

2   he desires to engage in a fishing expedition in case something useful might be uncovered.

3          Plaintiff cites to a few opinions that permitted limited discovery based on the specific

4   circumstances of those cases, but neglects to mention other cases from courts within the Ninth

5   Circuit that refused discovery after *Abatie*.  *See, e.g., Ford v. Motorola Inc. Involuntary*

6   *Severance Plan*, 2007 WL 162680 (D. Az. January 18, 2007), at *7 n.2 ("The Court, having

7   considered the inherent conflict of interest . . . finds that additional discovery is not necessary");

8   *Shemano-Krupp v. Mutual of Omaha Ins. Co.*, 2006 WL 3365595 (N.D. Cal. November 20,

9   2006), at *9 ("Here, Plaintiff requests discovery to uncover the extent of other possible conflicts. .

10  . .  Plaintiff's request to take additional discovery is DENIED.").

11         Here, plaintiff has not even said what discovery he would seek, but vaguely mentions

12  records subpoenas and "depositions of key individuals" who are not further identified.  The

13  clearest articulation of the fallacy of his position is found in *Harper v. Unum Life Ins. Co.*, 2007

14  WL 1792004 (E.D. Cal. 2007), where the plaintiff sought  depositions of claim analysts and

15  medical personnel.  *Id*. at *2.  In rejecting the argument that she had a right to conduct such

16  discovery, the district court ruled:

17         Defendant argues, and this Court agrees, that the depositions Plaintiff seeks are
18         not related to conflict of interest, but rather seek information related to a challenge
           to the decision made by Defendant.  Plaintiff argues that the discovery *is* related to
19         a conflict of interest because it will reveal that Defendant and its employees
           ignored and/or contradicted evidence specifically to deny Plaintiff's claim for
20         benefits.  Plaintiff's reasoning, though, misunderstands the distinction between
           conflict of interest discovery and discovery on the merits of her claim.  Despite her
21         belief, the discovery Plaintiff seeks goes *directly* to the reasoning behind the denial.
           . . .  Under the abuse of discretion standard applicable to this case, however, the
22         administrative record stands on its own, meaning that the case will be evaluated
23         solely on the information contained within it.  This renders the motivations and
           thought processes behind the actions of little use to the Court.
24

25  *Id*. at *5 (emphasis in original).

26         The court in *Harper* considered the amount of compensation paid to medical personnel

27  relevant to the conflict of interest issue, and permitted plaintiff to propound interrogatories.  *Id*.

28  Here, plaintiff apparently has obtained comparable information from other cases, although he has

1    offered the Court no explanation as to how it supposedly bears on any argument he makes.  There

2    is no reason to authorize the gathering of cumulative evidence, which anything he proposes to do

3    would be.[16]  Moreover, courts that have considered this issue after *Nord* have held that mere

4    retention of an IPC to conduct a file review is not a basis for permitting plaintiffs to conduct

5    discovery.

6            [P]laintiff's arguments in support of extending discovery are not persuasive.
             Plaintiff baldly questions the background, training, experience, and financial
7            relationship of defendant's independent physician, Dr. Lumpkins.  (Opp'n at 7.)
             However, the record establishes that Dr. Lumpkins is a physician specialized in
8            rheumatology who reasonably concluded, based on the information at her disposal,
             that plaintiff was not fully prevented from working.  Plaintiff presents no reasons
9            or evidence to find otherwise, and thus, the court cannot find that the requested
             discovery would demonstrate the existence of a conflict beyond the inherent
10           conflict presented because defendant administrates and funds the Plan.

11

12   *Chadwick v. Metropolitan Life Ins. Co.*, 498 F. Supp. 2d 1309, 1315 (E.D. Cal. 2007); *see also*

13   *Disanto v. Wells Fargo & Co.*, 2007 WL 2460732 at *11 (M.D. Fla. August 24, 2007) (rejecting

14   contention that physician's opinions should be ignored because he was retained through NMR).

15           **E.    Defendants Are Entitled to Judgment**

16           Plaintiff has not established the MetLife abused its discretion in denying his claim.  He

17   offers (without evidentiary foundation or authentication) documents from other cases, apparently

18   produced by third parties, regarding gross sums of money allegedly paid to NMR by MetLife for

19   medical review referrals.  *See* Green Declaration, Exhibit B.  He offers no explanation as to what

20   probative value such information allegedly has in this case, or why (or for what purpose) it could

21   or should be considered by the Court.

22

23           [16] As *Harper* held, discovery aimed at the merits of IPCs' opinions – that is, why they reached
     the conclusions they reached, and on what basis – is not "conflict" discovery and thus would not
24   be appropriate in any case, since review will be under the abuse of discretion standard (and a
     fiduciary cannot be found, on the basis of information that was not before it, to have abused its
25   discretion).  Even when a court's review is *de novo*, however, a case will be decided on the basis
     of the administrative record, and discovery will be appropriate only when and to the extent that
26   the reviewing court requires additional information in order to understand the administrative
     record.  *See Mongeluzo v, Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938,
27   943-944 (9th Cir. 1995).

28

1    Plaintiff also relies on various reported decisions involving NMR referrals, in which (since,

2  of course, approved claims do not generate litigation) there were claim denials, ultimately

3  resulting in criticism of reviewing doctors.  Those cases, however, say nothing about the merits of

4  *this* plaintiff's claim.  Every disability case presents unique facts, and stands or falls on its own

5  merits.  Proof of disability is always a plaintiff's burden, and summary judgment is warranted here

6  because plaintiff did not establish a functional impairment rendering him disabled under the Plan.

7  *Jordan v Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1157 (C.D. Cal.

8  1999); *see Martin v. Continental Cas. Co.,* 96 F.Supp.2d 983, 994 (N.D. Cal. 2000); *see also*

9  *Semien v. Life Ins. Co. of North America,* 436 F. 3d 805 (7th Cir. 2006).

10    Nothing that plaintiff has offered in his opposition calls into question the propriety of the

11  decision on his claim.  MetLife did not abuse its discretion in denying the claim, and defendants

12  therefore are entitled to judgment in their favor.

13  **V.    CONCLUSION**

14    For the reasons set out above and in their MSJ Brief, defendants are entitled to judgment

15  in their favor and against plaintiff, without a delay under Federal Rule of Civil Procedure 56(f).

16

17  Dated:  January 31, 2007              SEDGWICK, DETERT, MORAN & ARNOLD LLP

18

19                          By   /s/ Rebecca A. Hull
                                Rebecca A. Hull
20                               Attorneys for Defendants

21

22

23

24

25

26

27

28

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT