IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WALKER,<br><br>          Plaintiff,<br><br>   v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, KAISER PERMANENTE FLEXIBLE BENEFITS PLAN, and DOES 1 through 10, inclusive,<br><br>          Defendants.<br>_____ / | No. C 07-03772 WHA<br><br>**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND PROPOUNDING INTERROGATORY TO DEFENDANT METLIFE** |

**INTRODUCTION**

In this disability-benefits action under the Employee Retirement Income Security Act, plaintiff David Walker sued defendants Metropolitan Life Insurance Company and the Kaiser Permanente Flexible Benefits Plan for denying his claim for long-term disability benefits. The proper standard of review for MetLife's claim determination is abuse of discretion. A necessary factor in the abuse of discretion analysis is MetLife's undisputed structural conflict of interest as both claim administrator and payor. MetLife's conflict is compounded by its reliance on allegedly biased physician reviewers. Critical gaps in the administrative record render it insufficient to properly vet the influence of MetLife's conflict, as compounded by its reliance on the physician reviewers, on its exercise of discretion. Therefore, the parties' cross-motions for summary judgment are **DENIED** and MetLife is hereby ordered to produce,

**WITHIN THIRTY DAYS**, the information described in the court-ordered interrogatory propounded below.

## STATEMENT

Mr. Walker worked as a local area network administrator for Kaiser Foundation Hospitals from March 1998 until August 20, 2005, at which point he took a medical leave of absence and has not since returned to work. Mr. Walker's job, according to the description provided by Kaiser, required him to provide technical support and training and involved sitting, walking, bending, and occasional lifting of up to fifty pounds. According to Mr. Walker, sitting at a computer and typing is only a small part of what he did. He maintains he also had to lift and carry computers, replace monitors, and "crawl around the floor connecting wiring for computers and climbing up in ceilings pulling wires" (AR 180).

As a Kaiser employee, Mr. Walker participated in the Kaiser Permanente Flexible Benefits Plan, a welfare-benefit program governed by ERISA which designated MetLife as the insurer of benefits and the claim fiduciary. In January 2006, Mr. Walker filed a claim for long-term disability benefits with MetLife on the ground that he was totally disabled from working in his occupation due to cardiac and blood pressure problems which left him with shortness of breath, chest pain, and insufficient stamina. Under the terms of the plan, participants of at least 61 years of age, like Mr. Walker, were entitled to a maximum benefit duration of 48 months, provided they were found totally disabled. The plan stated, in pertinent part (emphasis added):

> You are considered totally disabled if:
>
> • During your elimination period (see below) and the next 24-month period, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy, or;
>
> • After the first 24 months, you are unable to earn more than 80% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified, taking into account your education, training, experience and pre-disability earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not

> limited to, recession, job obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.
>
> *Your elimination period is the six-month period of time during which no LTD [long-term disability] benefits are payable, beginning on the day you became disabled.* You must be under continuous care of a doctor during your elimination period.

(*id.* at 108). Given the plan's six-month elimination period, in order to award benefits to Mr. Walker MetLife would have had to find him totally disabled from his last day of work on August 20, 2005 through February 10, 2006.

The plan also required that participants seeking disability apply for disability benefits with the Social Security Administration. Mr. Walker did so and in September 2006 the Social Security Administration awarded him disability benefits of approximately $1,440.50 per month, including a back payment award of $8,934 for the period beginning February 2006 through August 2006 (*id.* at 258–260). The record in this case includes only the award itself, without any accompanying documents indicating the basis upon which the award was made. There is no evidence that MetLife considered the Social Security award in its decision to deny Mr. Walker's claim, or that it sought to obtain information regarding the basis of the Social Security determination.

The medical records on file in this case show Mr. Walker suffered from conditions including diabetes, hypertension, dyslipidemia, glaucoma, coronary vascular disease, organic heart disease, high blood pressure, macular degeneration of his left eye, and blindness since birth in his right eye. An "Attending Physician's Statement" completed at the request of MetLife by Mr. Walker's primary care physician at Kaiser, Dr. George Chuang, M.D., listed Mr. Walker's functional capacity as Class 3 (Marked Limitation), and advised that Mr. Walker not return to work until July 2006. Dr. Kathleen Kelley, however, a physician consultant retained by MetLife to review Mr. Walker's file, concluded there did not appear to be documentation of significant functional impairment past October 2005. Based on this lack of documentation, Dr. Kelley opined that Mr. Walker was "able to function in his own occupation beyond that date" (*id.* at 531).

3

Dr. Kelley recommended that her report be sent to Dr. Chuang for a response. She asked that Dr. Chuang comment on Mr. Walker's shortness of breath, vision, fatigue, cardimyopathy, and pulmonary diagnoses. In April 2006, MetLife sent a copy of Dr. Kelley's report and questions to Dr. Chuang. The following month Dr. Chuang responded. The entirety of his response consisted of a brief handwritten note stating, "Noted. I agree with the plan for long-term disability" (*id.* at 494). Mr. Walker argues the note indicates "Dr. Chuang did not read the materials sent to him but rather confirmed his 'plan' for long term disability for Mr. Walker. As nothing was sent to Dr. Chuang about MetLife's 'plan' for long term disability, it would seem reasonable to understand Dr. Chuang as referring to his previous plan for Mr. Walker to stay off work" (Plaintiff's Br. 7).

Maintaining that Dr. Chaung had agreed with Dr. Kelley's assessment, MetLife found that Mr. Walker was unable to perform his occupation through October 2005 but was able to do so thereafter. This finding rendered Mr. Walker ineligible for benefits, as he was determined to not be continuously disabled throughout the six-month elimination period. MetLife wrote to Mr. Walker stating his claim had been denied.

In August 2006, Mr. Walker appealed. His counsel requested a copy of his file and asked that the appeal not be decided until they could review the entire file and submit additional evidence. In February 2007, Mr. Walker submitted a 187-page formal appeal. Included therein was a letter from Dr. Jason Jones who had performed laser eye surgery on Mr. Walker, over 100 pages regarding medication side effects, and the results of a stress test showing Mr. Walker's susceptibility to shortness of breath and chest tightness. The appeal letter asserted Mr. Walker remained disabled after October 2005 due to his medical conditions and medication side effects. Mr. Walker stated he continued to suffer from congestive heart failure, diabetes mellitus, peripheral neuropathy, nephropathy, hypertension, chronic renal failure, coronary vascular disease, fatigue, dizziness, lightheadedness, blurred vision, nervousness, chest pain, confusion, and headaches. He stated Dr. Chuang had opined that he remained "very limited" and unable to "sustain an 8 hour workday in any career given his symptoms" (AR 262).

4

MetLife referred Mr. Walker's file to the independent medical referral bureau, National Medical Review ("NMR"), requesting physician reviews and answers to specific questions from members of NMR's physician panel with appropriate areas of specialization (*id.* at 252). NMR referred Mr. Walker's file to internist and cardiologist, Dr. Michael J. Rosenberg, and to ophthalmologist, Dr. David Turok. Neither examined Mr. Walker directly. Dr. Rosenberg concluded that the file showed Mr. Walker was obese, diabetic, and suffered from some heart disease. He opined that Mr. Walker "would be capable of medium work on a full time basis" (id. at 244). Dr. Turok stated Mr. Walker's level of functionality was not restricted by blurred or monocular vision. He reported that Mr. Walker was well-controlled with his current medications.

In March 2007, MetLife faxed the medical reviewers' reports to Dr. Chuang and Dr. Jones. Dr. Chuang responded in April 2007, stating Mr. Walker's "opthalmologic involvement (diabetic retinopathy) from his diabetes is problematic for him to function normally. His retinopathy will only get worse." Dr. Chuang also indicated Mr. Walker's "functionality is significantly limited by the edema in his lower legs caused by [congestive heart failure], vasodilating medications and as well as significant pain from the diabetes neuropathy." Dr. Chuang stated that "[w]ith combination of [Mr. Walker's] ophthalmologic involvement, edema of his lower extremities and pain from diabetes neuropathy in addition to his complicated medical history . . . I will strongly advise you to reconsider his claim to disability" (*id.* at 238).

Dr. Rosenberg called Dr. Chuang to discuss Mr. Walker's medical condition. Dr. Chuang did not respond. Dr. Rosenberg then provided a supplemental report stating nothing had changed his opinion about Mr. Walker's ability to perform medium-level work. MetLife submitted further questions to Dr. Rosenberg and Dr. Turok, inquiring whether Mr. Walker's medications caused functional impairment. Both doctors answered that they did not.

In June 2007, MetLife concluded Mr. Walker was capable of performing his own job and that the medical documentation did not show he was disabled throughout the elimination period. Accordingly, MetLife informed Mr. Walker that it had denied his appeal. Mr. Walker had exhausted his administrative remedies.

5

\* \* \*

In July 2007, Mr. Walker sued defendants under ERISA, 29 U.S.C 1132(a), (e), (f), and (g), claiming MetLife abused its discretion in denying his claim. In January 2008, defendants moved for summary judgment. In opposition thereto, Mr. Walker requested further discovery on the grounds that MetLife knowingly relied on biased NMR reviewers and operated under a structural conflict of interest in denying his claim as MetLife both funded and determined eligibility for plan benefits. The Court granted Mr. Walker limited discovery on these issues.

In April 2008, the parties requested that the discovery completion date be stayed and the briefing schedule continued pending the outcome of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343 (2008), wherein two issues had been accepted for review: (i) whether the Sixth Circuit had erred in holding, in conflict with two other circuits, that the fact that a claim administrator of an ERISA plan also funds the plan benefits, without more, constituted a "conflict of interest" which must be weighed in a judicial review of the administrator's benefit determination under *Firestone Tire & Rubber v. Brunch*, 489 U.S. 101 (1989); and (ii) where an administrator that both determines and pays claims under an ERISA plan is deemed to be operating under a conflict of interest, how that conflict should be taken into account on judicial review of a discretionary benefit determination. Because the parties had already moved so far along with discovery, the request to stay discovery was denied. Because it was possible, however, that *Glenn* could influence the motions for summary judgment, the request to continue the briefing schedule was granted.

Thereafter, defendants renewed their motion for summary judgment on the ground that MetLife did not abuse its discretion in denying benefits to Mr. Walker. Mr. Walker has cross-moved for summary judgment maintaining MetLife conducted a biased claims investigation, failed to conduct a full and fair review, and abused its discretion in denying him disability benefits.

**ANALYSIS**

ERISA's purpose is "to protect . . . the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries

6

of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. 1001(b).

Just three months ago, the Supreme Court explained in *Glenn*, 128 S.Ct. at 2350:

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, *see* § 1132(a)(1)(B).[1]

Judicial review under ERISA is provided for in section 1132(a)(1)(B) which states that a participant in an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

The Supreme Court addressed the standard of judicial review of benefit determinations by fiduciaries or plan administrators under ERISA in *Glenn*, wherein it elucidated what it had earlier set forth in *Firestone*. *Firestone,* 489 U.S. at 115, provided that principles of trust law require courts to review a denial of plan benefits "under a *de novo* standard" unless the plan provides to the contrary. Where the plan provides to the contrary by granting "the administrator or fiduciary discretionary authority to determine eligibility for benefits," *ibid.* "[t]rust principles make a deferential standard of review appropriate," *id.* at 111. Furthermore, where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Id.* at 115.

*Glenn*, 128 S.Ct. at 2348, held that "the kind of 'conflict of interest' to which [*Firestone*] refers" includes cases in which "a plan administrator both evaluates claims for benefits and pays

---

[1] Unless indicated otherwise, internal citations are omitted from all quoted authorities in this order.

7

benefits claims." *Glenn*, *id.* at 2350, provided the following guidance for evaluating the conflict of interest factor:

> We turn to the question of how the conflict we have just identified should be taken into account on judicial review of a discretionary benefit determination. In doing so, we elucidate what this Court set forth in *Firestone*, namely, that a conflict should be weighed as a factor in determining whether there is an abuse of discretion. We do not believe that *Firestone*'s statement implies a change in the standard of review, say, from deferential to de novo review . . . Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural evidentiary rules, focused narrowly upon the evaluator/payor conflict . . . We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.

The Ninth Circuit recently noted that *Glenn* endorsed the approach it had adopted in *Abatie v. Alta Life & Health Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (en banc). *Wilcox v. Wells Fargo & Co. Long Term Disability Plan*, 2008 WL 2873735, at *1 (9th Cir. 2008); *see also Hoskins v. Bayer Corp.*, 564 F. Supp. 2d 1097, 1103 (N.D. Cal. 2008) (stating no inconsistency found between *Abatie* and *Glenn*). Like *Glenn*, *Abatie* held that a conflict of interest must be weighed as a factor in abuse of discretion review. *Abatie*, 458 F.3d at 959, 968, also held that a court should temper its abuse of discretion review with "skepticism commensurate with the plan administrator's conflict of interest" taking into account "all the circumstances before it." It noted, *id.* at 968–969:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Similarly, *Glenn*, 128 S.Ct. at 2351, explained that the conflict of interest should prove more important where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a

8

history of biased claims administration; it should prove less important where the administrator has taken active steps to reduce potential bias and to promote accuracy.

*Abatie*, 458 F.3d at 969, recognized that weighing a conflict as a factor in an abuse of discretion review is indefinite, but stated:

> We believe, however, that trial courts are familiar with the process of weighing a conflict of interest. For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias. What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records. We believe that district courts are well equipped to consider the particulars of a conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred.

Abatie also noted that this "careful, case-by-case approach . . . alleviates the unreasonable burden" placed on ERISA plaintiffs in precedent such as *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004), wherein the influence of an administrator's conflict would be considered only if the plaintiff brought forth evidence of a serious conflict, thereby triggering *de novo* review; otherwise, the administrator's denial of benefits would be upheld "so long as it was grounded on *any* reasonable basis." *Ibid.* (quoting *Jordan*, 370 F.3d at 875) (emphasis in original). *Abatie* held that going forward, "[p]laintiffs will have the benefit of an abuse of discretion review that always considers the inherent conflict when a plan administrator is also the fiduciary, even in the absence of 'smoking gun' evidence of conflict." *Ibid.*

*Abatie* advised that, given this closer scrutiny, conflicted administrators "may find it advisable to bring forth affirmative evidence that any conflict did not influence its decisionmaking process, evidence that would be helpful to determining whether or not it has abused its discretion." *Ibid.* It might, for example "demonstrate that it used truly independent medical examiners[.]" *Id.* at 969 n.7.

\*         \*         \*

9

Here, the employee welfare-benefit plan gave MetLife, the plan administrator, the discretion to make claim determinations. The umbrella plan document, "Kaiser Permanente Welfare Benefits Plan," provided, in relevant part:

> 4.1   <u>Named Fiduciaries.</u>  The named fiduciaries with respect to each Plan, for purposes of ERISA, shall be the Employers whose employees participate in such Plan. With respect to each Program in which benefits are provided under a Contract in which the Insurer is responsible for review of the benefit claim determination, such Insurer is the named fiduciary with respect to such determinations, pursuant to ERISA Regulation § 2560.503-1(g)(2).
>
> In addition, the Employer may identify further named fiduciaries by (i) notifying such person(s) in writing of its designation or (ii) allocating or delegating fiduciary responsibilities to such person under Section 4.2.
>
> 4.2   <u>Allocation and Delegation of Fiduciary Responsibility</u>
> a.   Each Named Fiduciary is allocated fiduciary responsibility with respect to the specific discretionary authority exercised by it, under the Contract(s) relating to the Program(s) in which such Named Fiduciary participates.
>
> \*          \*          \*
>
> 4.4   <u>Discretionary Authority of Fiduciaries.</u>  Each Named Fiduciary, and each person to whom fiduciary authority shall have been allocated or delegated under Section 4.2, shall have full and complete discretionary authority with respect to its responsibilities under the Plan and any Program hereunder. All actions, interpretations, and decisions of a Named Fiduciary or a delegate thereof shall be conclusive and binding on all persons and shall be given the maximum possible deference allowed by law.

(AR 7). Mr. Walker does not dispute that the plan conferred discretion on MetLife.

In addition to conferring discretion on MetLife, the plan named MetLife as claim administrator and payor,[2] thereby creating a structural conflict of interest. MetLife does not dispute this. Accordingly, this order reviews MetLife's claim determination for abuse of discretion, taking into account MetLife's structural conflict of interest as compounded by its

---

[2] This dual role is acknowledged in the Summary Plan Description which states, "MetLife is the insurer and third party administrator for the Employee life, Dependent life and Long-Term Disability insurance plans . . . In the event of a Long-Term Disability, you must also provide this information to MetLife, the administrator for Long-Term Disability claims" (AR 163-64). In short, MetLife both funded the benefits to be paid under the Plan and, as claim administrator, determined eligibility for benefits.

10

reliance on NMR. In so doing, the parties' respective motions for summary judgment will be construed as motions for judgment under FRCP 52, in order that the Court may weigh evidence relevant to the conflict of interest bearing on MetLife's exercise of discretion, as it is required to do under *Glenn* and *Abatie*.

\*          \*          \*

MetLife argues that its decision to deny Mr. Walker's claim for long-term disability benefits must be upheld because no abuse of discretion on its part is evidenced in the administrative record. MetLife maintains that, in reviewing Mr. Walker's claim and generating the administrative record, it obtained medical opinions from appropriate sources and gave Mr. Walker multiple opportunities to provide his side of the story. MetLife states that "[t]his is hardly the picture of a conflicted administrator putting its own interests ahead of its duty to evaluate claims fully and fairly" (Defendants' Opp. 12).

MetLife is correct that the administrative record lacks evidence that its conflict of interest adversely influenced its exercise of discretion in this case. Critical gaps in the record, however, render it insufficient to properly vet the effect of MetLife's conflict. Most importantly, the record was developed and the decision was made largely in reliance upon NMR, a company MetLife knows benefits financially from doing repeat business with it. NMR received more than $11 million from MetLife between 2002 and 2007 (Green Decl., Exh. B at 4). It follows that MetLife knows NMR has an incentive to provide it with reports upon which MetLife may rely in justifying its decision to deny benefits in order to increase the chances that MetLife will return to NMR in the future.

Key to determining whether MetLife's conflict of interest, compounded by its reliance on a company with an incentive to provide it biased reports, led to a "parsimonious claims granting history" in the words of *Abatie* or a "history of biased claims administration" in the words of *Glenn*, is statistical information regarding NMR physician reviews relied upon by MetLife in making its disability claim determinations. When Mr. Walker sought to obtain this information through discovery, however, MetLife contended that neither it nor NMR maintained such "track record" information and that generating it would be too burdensome and expensive.

11

In support of its contention of undue burden and expense, MetLife provided Mr. Walker with its responses to interrogatories propounded by a different plaintiff in a different ERISA action pending before the Northern District of California, *Dilley v. MetLife*, Case No. 07-01831 PJH (N.D. Cal.). Therein MetLife was asked to provide figures including the number of claims it had referred to NMR since 2002 and the number of claims it had denied based, in whole or in part, upon NMR reviews. As to the number of claims referred to NMR, MetLife stated it referred 3,593 claims in 2007, 3,159 claims in 2006, and 2,304 claims in 2005. MetLife declined to provide referral statistics for prior years on the ground that it was unduly burdensome and expensive because the information before 2005 was maintained on microfilm. As to the number of claims denied in reliance on NMR reviews, MetLife provided no statistics at all, stating it was unduly burdensome and expensive as it would require an estimated 2,264 hours of worker time to compile the information for years 2005 through 2007 alone.

Though MetLife provided its responses to the *Dilley* interrogatories in order to support its contention that producing the information was unduly burdensome and expensive, it has likewise, albeit inadvertently, underscored the demand for transparency regarding its claims-granting history in reliance on NMR. Counsel points to yet another case in which an insurer refused to produce information regarding the track record of its reliance on NMR reviewing physicians, *Denmark v. Liberty Life Assur. Co. of Boston*, 2005 WL 3008684 (D. Mass.). There, the court ordered the insurer to stipulate to the number of claims it had accepted or granted and rejected or denied after a review by a physician retained through NMR. When the insurer refused to comply due to "burden and expense," the *Denmark* court drew an inference that NMR physicians had not found in favor of a single claimant referred for review by the insurer to NMR during the years in question. MetLife opposes any similar inference in this case stating no such order for production was issued or is warranted.

MetLife is mistaken that such an order is not warranted. *First*, without this information, the influence of MetLife's conflict of interest as compounded by its reliance on NMR cannot readily be determined from the record at hand. *Second*, producing this information is consistent with the Ninth Circuit's advice to conflicted administrators in *Abaite* "to bring forth affirmative

12

evidence that any conflict did not influence its decisionmaking process, evidence that would be helpful to determining whether or not it has abused its discretion." *Abatie*, 458 F.3d at 969. It might, for example "demonstrate that it used truly independent medical examiners[.]" *Id.* at 969 n.7. *Third*, in light of *Glenn* and *Abatie*, the demand for such statistics elucidating the influence of insurer conflicts of interest will only grow. While this order does not doubt MetLife's contention that producing such information will be costly, in the short run, the sooner it is able to readily generate such information the greater its savings will be, in the long run, via shortened discovery disputes and, if no conflict is shown, reduced litigation on this point. The public too, will be spared the expense of undue court congestion on these issues.

Accordingly, MetLife is hereby ordered, **WITHIN THIRTY DAYS**, to state under order the number of claims it has accepted or granted and rejected or denied after a review by a physician retained through NMR from 2005 through 2007. Absent such an answer, this Court will infer that MetLife has not granted a single claim in which NMR reviews were obtained. A trial will then be required in order to fully vet MetLife's exercise of discretion and the role played by its conflict therein.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are **DENIED** and MetLife is ordered to produce, **WITHIN THIRTY DAYS**, the information described in the court-ordered interrogatory propounded above.

**IT IS SO ORDERED.**

Dated: November 10, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13